**RELIGIOUS TECHNOLOGY CENTER and Church of Scientology International, Inc., Plaintiffs-Appellees,**

v.

**Larry WOLLERSHEIM, et al., Defendants,**

**and**

**Church of the New Civilization, Harvey Haber, Dede Reisdorf, Jon Zegel and David Mayo, Defendants-Appellants.**

**No. 85–6547.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 5, 1986.

Decided Aug. 8, 1986.

Joseph Yanny, Herzig & Yanny, Beverly Hills, Cal., Earle C. Cooley, Cooley, Manion, Moore & Jones, P.C., Boston, Mass., for plaintiffs-appellees.

Michael J. Treman, Santa Barbara, Cal., Richard C. Brautigam, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for defendants-appellants.

Before PREGERSON, POOLE and THOMPSON, Circuit Judges.

PREGERSON, Circuit Judge.

The Church of the New Civilization ("new church") is a splinter from the Church of Scientology ("Church"). The Church alleged that certain scriptural materials offered by the new church were copies of materials stolen from the Church. Recognizing federal jurisdiction under the Racketeer Influenced and Corrupt Organization Act ("RICO"), the district court held that the Church's materials constituted a trade secret and granted the Church a preliminary injunction ordering the new church to desist from using or disseminating the disputed materials.

We reverse the district court's order granting a preliminary injunction. Pursuant to this court's order, the district court advised that it issued its preliminary injunction "on both the plaintiffs' 18 U.S.C. §§ 1861–1968 [1961–1968] ("RICO") claim and on plaintiffs' state law trade secrets claim." We resolve the appeal, therefore, under both these theories. We hold that injunctive relief is not available to a private plaintiff in a civil RICO action. Additionally, we hold that the California courts would conclude that sacred scriptures do not meet the definition of a trade secret under California law.

FACTS

The Church of Scientology teaches that a person's behavior and well-being are improved by removing "engrams" from the unconscious mind. Engrams are impressions recorded by the unconscious mind in times of trauma in this life or in previous lives. Engrams return in moments of similar stress to the detriment of the person's behavior. Removing engrams from the unconscious permits the person's analytical mind to function unhindered.

Engrams are located and purged through "auditing." Auditing uses the "technology" and "advanced technology" of the Church. An "auditor" directs a set of structured questions and drills ("rundowns") at the Church adherent. The adherent's responses are measured on a "Hubbard E-meter" which reflects changes in "skin voltage." The auditor's aim is to detect the "buttons" which indicate a conscious or subconscious response to the rundown and enable the adherent to identify his or her engrams. The adherent must proceed through a series of increasingly sophisticated technologies of closely structured questions and answers to reach "a higher spiritual existence."

The Church asserts that the unsupervised, premature exposure of an adherent to these materials will produce a spiritually harmful effect.[1] The Church keeps the

---

**1.** The new church, which follows essentially    identical religious precepts and practices to

higher level materials in secure places, and makes the materials available only to adherents who agree in writing to maintain their confidentiality. The Church stated to the district court that it does "not safeguard these materials from any commercial consideration."

Defendant David Mayo was apparently at one time a close associate of Church founder L. Ron Hubbard, and assisted in the preparation of the Church's higher level materials.[2] Following an acrimonious dispute between Mayo and other senior Church officers, Mayo left the Church and, in July 1983, established the Church of the New Civilization. The new church embraces beliefs and provides counseling and training to its adherents which are essentially identical to those offered by the Church.

In December 1983, Robin Scott, and two others (all of whom are unrelated to this action) stole certain higher level materials from Church offices in Copenhagen, Denmark. Danish authorities subsequently convicted Scott of burglary. While the stolen materials were returned, the Church maintains that copies were made and that the new church later acquired these copies. The district court found that the higher level materials offered to its adherents by the new church are "essentially identical" to the stolen Church materials.[3]

The present suit was filed on November 4, 1985. The Church states that, in late October 1985, it learned that the new church intended to disseminate the contents of the materials stolen by Scott "in a non-confidential setting." Counsel for defendant Larry Wollersheim, a former Church adherent who has a pending California state tort action against the Church, had obtained copies of the higher level materials during the deposition of defendants Margaret Singer and Richard Ofshe. Sing-

---

those of the Church, does not dispute this assertion.

**2.** The new church asserts that Mayo authored the disputed higher level materials. The Church vigorously disputes this, maintaining that Hubbard created all Church materials.

Hubbard apparently assigned the materials, together with other materials forming the technology and advanced technology of "Scientology" and "Dianetics," to the Religious Technology Center. See Church of Scientology International v. The Elmira Mission of the Church of Scientology, 794 F.2d 38, 45 (2d Cir.1986) (Hubbard validly assigned his rights in all Scientology materials to Religious Technology Center). Hubbard apparently intended the Center to be the "trustee of the scriptures" of Scientology. The Center makes available the higher level materials of the advanced technology to Church offices around the world in the form of "packs." Apparently the advanced technology packs at issue here are only available at six Church offices in the world.

Many lower level materials are copyrighted, and these copyrights apparently passed to the Religious Technology Center in Hubbard's will. The trademarks "Dianetics" and "Scientology" are now similarly held by the Center. The higher level materials at issue in this suit have neither copyright nor trademark protection.

**3.** The new church states that it began using its higher level materials in August 1983, before the Scott theft. It claims that Mayo, as the princi-

pal original author of the Church's materials, wrote the new church's materials from memory. It also asserts that the new church's materials differ from the Church's materials because they reflect "improvements" recently added by Mayo. The district court rejected Mayo's testimony as not credible. "The court does not believe that anyone, even Mr. Mayo, could have reproduced from memory materials substantially identical to those stolen in Denmark from the church. The documents are too voluminous, too detailed and too nearly identical in substance and wording to have been created by Mr. Mayo without reference to the stolen documents."

The new church asserts that there is no evidence to link the new church to the Scott theft. The Church offered evidence to the district court of international phone calls by new church members around the time of the theft, and produced a handwritten memorandum in which defendant Harvey Haber, then a new church officer, referred to a conversation with a person alleged to be Ron Lawley, a colleague of Scott. The memo then records what appears to be a continuing series of negotiations involving an offer and counteroffer. The memo does not refer to any agreement between the negotiating parties. The Church's complaint alleges that the new church obtained the materials from Scott's colleagues in February 1984.

Because we dissolve the injunction on jurisdictional grounds, we express no view whether the new church's materials are copies of the Church materials stolen by Scott.

er had obtained the materials from defendant Leta Schlosser. Schlosser testified that she had received the materials from an adherent of the new church. On November 1, 1985, the Los Angeles Superior Court hearing Wollersheim's suit against the Church refused a Church request to seal its records including the Church's higher level materials. Three days later, the Church brought this suit in federal court against the new church, its principal officers, Wollersheim, his counsel, and those allegedly involved in passing the materials to Wollersheim's counsel. The suit based jurisdiction on the RICO claim and stated six pendent California state law claims including misappropriation of trade secrets.

The district court first granted a temporary restraining order preventing the state court plaintiff and the new church from disclosing the confidential materials. The court then conducted an evidentiary hearing lasting two days, and, on November 23, 1985, granted the Church the preliminary injunction that prompted this appeal.

The injunction prohibited the new church, its officers "and those persons in active concert or participation with them or who are acting at their request or insistence ... from using, distributing, exhibiting or in any way publicly revealing" any version of certain enumerated higher level Church materials. The enjoined parties were required to return all such material in their possession to the court under seal. The court also required the Church to post a bond of $100,000.

In supplementary findings of fact, the district court stated that it "views this as a stolen document case." The court recognized that both parties accepted that adherents must be exposed to the materials in strict progression. On this basis, the court concluded that Church adherents may suffer irreparable harm from the unsupervised dissemination of the materials, thus justifying preliminary injunctive relief. In additional comments from the bench, the district court held the materials to constitute a misappropriated trade secret but noted that the Church was not arguing commercial disadvantage as an injury. The court also recognized its jurisdiction under RICO "based on the idea that the documents were stolen and that they found their way into their present use."

The new church filed a timely appeal. We denied the new church a stay pending appeal, but heard the appeal on an expedited schedule. We have jurisdiction under 28 U.S.C. § 1292(a)(1).

## STANDARD OF REVIEW

Determining whether a private remedy should be afforded for violation of duties mandated by a statute that does not expressly create a suitable private remedy causes the concepts of "standing," "subject matter jurisdiction," and "implication of a private cause of action" to "overlap ... even more than they ordinarily would." *National Railroad Passenger Corp. v. National Association of Railroad Passengers,* 414 U.S. 453, 455–56, 94 S.Ct. 690, 691–92, 38 L.Ed.2d 646 (1974). The issue is best described as falling within the generic problem of "federal jurisdiction" without attempting to characterize it with greater specificity. *See generally* 13 C. Wright, A. Miller, and E. Cooper, *Federal Practice and Procedure* § 3531.6 at 494–506 (2d ed. 1984). We are obligated to raise a jurisdictional issue *sua sponte* as a threshold question before considering a matter on its merits. *See Solano v. Beilby,* 761 F.2d 1369, 1370 (9th Cir.1985); *Othman v. Globe Indemnity Co.,* 759 F.2d 1458, 1462–63 (9th Cir.1985). Interpretation of the statute under which an injunction has been issued is a question of law, which we review *de novo. California ex rel. Van de Kamp v. Tahoe Regional Planning Agency,* 766 F.2d 1308, 1312 (9th Cir.1985). We review matters of state law *de novo. In re McLinn,* 739 F.2d 1395, 1403 (9th Cir.1984) (en banc).

### I. *Is Injunctive Relief Available to a Private Party in a Civil RICO action?*

#### A.

The Church's basis for federal jurisdiction is 18 U.S.C. § 1964 ("civil RICO").[4] Civil RICO permits both the government and private plaintiffs to sue for violations of substantive provisions of the Racketeer Influenced and Corrupt Organizations Act, which formed Title IX of the Organized Crime Control Act of 1970, Pub.L. 91–452, 84 Stat. 941 (1970), as amended, *codified as* 18 U.S.C. §§ 1961–1968. Neither party questioned before the district court, nor in briefs before this court, whether injunctive relief is available under civil RICO. We ordered the parties to submit supplemental briefs on this issue.

Civil RICO is directed at "racketeering activity," which it defines as any act "chargeable" under several generically described state criminal laws; any act "indictable" under numerous specific federal criminal provisions, including mail and wire fraud; and any "offense" involving narcotics or bankruptcy or securities fraud "punishable" under federal law. 18 U.S.C. § 1961(1). Civil RICO prohibits the use of income derived from a "pattern of racketeering activity" in relation to an "enterprise" engaged in or affecting interstate commerce. 18 U.S.C. § 1962(a). A "pattern" of racketeering activity "requires at least two acts of racketeering activity." 18 U.S.C. § 1961(5). Broad criminal penalties are provided for RICO violations. *See* 18 U.S.C. § 1963. In addition, Congress provided for a civil enforcement scheme, including private treble damages actions. *See* 18 U.S.C. § 1964.

Despite repeated efforts by courts to limit the reach of civil RICO private damages actions, it is clear that suits alleging the requisite predicate acts are entitled to federal court jurisdiction, even if the acts are of a common-garden variety far removed from what is normally regarded as "organized crime" activity. *See Sedima, S.P. R.L. v. Imrex Co.,* — U.S. ——, 105 S.Ct. 3275, 3284–85, 87 L.Ed.2d 346 (1985) (civil RICO suit may be based on commercial contract dispute involving two allegations of mail and wire fraud; civil RICO jurisdiction requires no prior criminal convictions for predicate acts nor any showing of "racketeering injury.") The Church's complaint alleges that the higher level materials are the Church's trade secret which the new church misappropriated through several acts of mail or wire fraud constituting a pattern of racketeering activity.[5] The complaint characterizes the contacts between the new church and Wollersheim and his counsel as a conspiracy within RICO's definition of "enterprise." The Church's complaint also includes a claim for money damages under RICO. Thus, the Church apparently satisfies the federal jurisdictional requirements for a civil RICO *damages* action.[6]

---

4. The Church's complaint alleges federal jurisdiction under RICO, 18 U.S.C. § 1964. The complaint also alleges jurisdiction under 28 U.S.C. §§ 1332 and 1339, covering diversity, patent, trademark, and copyright matters, and pendent jurisdiction over several state claims. The parties are not diverse, both being California corporations. The complaint makes no substantive allegations of patent, copyright, or trademark infringement. Thus, RICO provides the *only* basis for federal court jurisdiction over the Church's complaint.

5. The new church characterizes the predicate acts as the Copenhagen burglary and the receipt of the stolen materials. It argues that since the theft was not punishable in the United States, it cannot be a predicate act, and thus the Church has not demonstrated a pattern of racketeering. Even if the Danish theft falls outside RICO, the Church alleges sufficient telephone and mail contacts between the new church and Scott's group to satisfy the pattern requirement through several predicate acts of mail and wire fraud.

6. While the complaint states a claim for money damages, at the hearing on the motion for the preliminary injunction, the Church denied that it had suffered financially from the new church's behavior. Rather, the Church characterized its injury as the harm caused to its adherents from premature, unsupervised exposure to the higher level materials. It is not clear whether such an injury is sufficient to allow the Church to press even a civil RICO damages action.

In *Sedima,* the Supreme Court stated that "the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation.... Where the plaintiff al-

### B.

No appellate court has expressly determined whether civil RICO permits a private party to secure *injunctive* relief. The Fourth Circuit has implied that injunctive relief is not available to a private civil RICO plaintiff, but reserved ultimate judgment on the matter. *See Dan River, Inc. v. Icahn*, 701 F.2d 278, 290 (4th Cir.1983) ("While we do not undertake to resolve the question ... [i]n light of the most recent indications from the Supreme Court, Dan River's action for equitable relief under RICO might well fail to state a claim."). In dictum in a moot appeal in *Trane Co. v. O'Connor Securities*, 718 F.2d 26, 28 (2d Cir.1983) the Second Circuit stated: "We have the same [serious] doubts [as courts such as the Fourth Circuit in *Dan River*] as to the propriety of private party injunctive relief...." More recently, in *Sedima, S.P.R.L. v. Imrex Co.*, 741 F.2d 482, 489 n. 20 (2d Cir.1984), *rev'd*, — U.S. —, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), the Second Circuit observed that "[i]t thus seems altogether likely that § 1964(c) as it now stands was not intended to provide private parties injunctive relief." However, the precedential value of this conclusion, itself somewhat equivocal, is thrown into considerable doubt by the Supreme Court's total rejection of the conclusions drawn by the Second Circuit from its historical analysis of the RICO statute. *See* 105 S.Ct. 3275.

In contrast, the Eighth Circuit, expressly without resolving the issue, has hinted that injunctive relief may be available either under civil RICO or under a court's general equitable powers. *See Bennett v. Berg*, 685 F.2d 1053, 1064 (8th Cir.1982) (citing a law review article which supports the availability of injunctive relief), *aff'd on rehearing*, 710 F.2d 1361 (8th Cir.) (en banc), *cert. denied*, 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983).[7] *See also USACO Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94, 97–98 (6th Cir.1982) (affirming grant of injunctive relief to private plaintiff on pendent state claims where RICO provided federal jurisdiction base).

A similar disunity of views exists among those district courts that have confronted the issue. The only three published decisions explicitly to hold that injunctive relief is not available to a civil RICO plaintiff are all from the Northern District of Illinois. *See Miller v. Affiliated Financial Corp.*, 600 F.Supp. 987, 994 (N.D.Ill.1984); *DeMent v. Abbott Capital Corp.*, 589 F.Supp. 1378, 1382–83 (N.D.Ill.1984); and *Kaushal v. State Bank of India*, 556 F.Supp. 576, 581–84 (N.D.Ill.1983). *See also Ashland Oil, Inc. v. Gleave*, 540 F.Supp. 81, 85–86 (W.D.N.Y.1982) (statutory attachment not available to private civil RICO plaintiff).

Two district courts have held that injunctive relief is available to a private civil RICO plaintiff. *See Aetna Casualty and Surety Co. v. Liebowitz*, 570 F.Supp. 908, 910–11 (E.D.N.Y.1983), *aff'd on other grounds*, 730 F.2d 905 (2d Cir.1984); and *Chambers Development Co. v. Browning-Ferris Industries*, 590 F.Supp. 1528, 1540–

leges each element of the violation, the compensable injury necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise." 105 S.Ct. at 3285–86. The district court found such a "nexus" between the Scott theft and the new church. The court did not expressly find a further nexus between the new church's actions via the predicate acts and the injury to the Church adherents. *Sedima* apparently requires such a nexus for civil RICO "standing."

Assuming that this nexus can be established, the injury alleged by the Church may not be compensable under civil RICO. In a footnote in *Sedima*, the Court explains that civil RICO damages "include, but are not limited to ... competitive injury." 105 S.Ct. at 3286 n. 15. In disagreeing with the dissent's attempt to limit civil

RICO standing, *Sedima* apparently embraces the notion that "harm proximately caused by the forbidden conduct" is compensable. *Id.* The court gives no indication whether nonfinancial proximate harm, such as the emotional-type injury alleged by the Church, is compensable under civil RICO. Since we are reviewing only the injunctive relief granted to the Church, we need not decide this issue. However, if the action proceeds to trial on the Church's damages claim, the district court will then be obliged to confront the problem.

7. The Eighth Circuit panel cited Blakey and Gettings, *Racketeer Influenced and Corrupt Organizations (RICO): Basic Concepts—Criminal and Civil Remedies*, 53 Temple L.Q. 1014, 1038 nn. 132–33 (1980) (statutory language provides for equitable relief). 685 F.2d at 1064.

41 (W.D.Pa.1984). Additionally, several district courts have *simply assumed* the availability of injunctive relief to civil RICO plaintiffs. *See USACO Coal Co. v. Carbomin Energy, Inc.,* 539 F.Supp. 807, 814–16 (W.D.Ky.), *aff'd on other grounds,* 689 F.2d 94 (6th Cir.1982); *Marshall Field & Co. v. Icahn,* 537 F.Supp. 413, 420 (S.D.N.Y.1982); *Vietnamese Fishermen's Association v. Knights of the Ku Klux Klan,* 518 F.Supp. 993, 1014 (S.D.Tex.1981).

Still other district courts have raised, but managed to avoid deciding the issue. *See McLendon v. Continental Group, Inc.,* 602 F.Supp. 1492, 1518–19 (D.N.J.1985) ("The law [in this area] is in great flux."); *Kaufman v. Chase Manhattan Bank, N.A.,* 581 F.Supp. 350, 359 (S.D.N.Y.1984).

■ Thus, we must decide essentially as a matter of first impression for an appellate court whether injunctive relief may be granted to a private plaintiff under civil RICO. When interpreting a statute, the plain meaning of the words used is controlling absent "a clearly expressed legislative intent to the contrary." *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981) (quoting *Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)); *Powell v. Tucson Air Museum Foundation of Pima County,* 771 F.2d 1309, 1311

(9th Cir.1985). When the language of a statute is ambiguous, we construe the statute in the light of Congress's purpose in enacting it as expressed in the legislative history. *See Train v. Colorado Public Interest Research Group, Inc.,* 426 U.S. 1, 9–10, 96 S.Ct. 1938, 1942, 48 L.Ed.2d 434 (1976).

### C.

Section 1964 has four parts.[8] Part (c) was added late in RICO's legislative passage through Congress. The bill passed by the Senate included only the present parts (a), (b), and (d). *See infra* pages 1083–84; *Sedima,* 105 S.Ct. at 3280–81.

Part (a) is a broad grant of equitable jurisdiction to the federal courts. Part (b) permits *the government* to bring actions for equitable relief. Part (d) grants collateral estoppel effect to a criminal conviction in a subsequent civil action by the government. Part (c), the private civil RICO provision, states that a private plaintiff may recover treble damages, costs and attorney's fees. In contrast to part (b), there is no express authority to *private plaintiffs* to seek the equitable relief available under part (a).

Admittedly, part (c) also does not expressly limit private plaintiffs "only" to the enumerated remedies, nor does part (a) expressly limit the availability of the illustra-

---

**8.** 18 U.S.C. § 1964 states:

(a) The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.

(b) The Attorney General may institute proceedings under this section. In any action brought by the United States under this section, the court shall proceed as soon as practicable to the hearing and determination thereof. Pending final determination thereof, the court may at any time enter such restraining orders or prohibitions, or take such other actions, including the acceptance of satisfactory performance bonds, as it shall deem proper.

(c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

(d) A final judgment or decree rendered in favor of the United States in any criminal proceeding brought by the United States under this chapter shall estop the defendant from denying the essential allegations of the criminal offense in any subsequent civil proceeding brought by the United States.

tive equitable remedies to the government. *See* Strafer, Massumi, and Skolnick, *Civil RICO in the Public Interest: "Everybody's Darling,"* 19 Am.Crim.L.Rev. 655, 710 (1982). However, the inclusion of a single statutory reference to private plaintiffs, and the identification of a damages and fees remedy for such plaintiffs in part (c), logically carries the negative implication that *no other remedy* was intended to be conferred on private plaintiffs.

As the Supreme Court has emphasized, Congress expressly admonished that RICO "be liberally construed to effectuate its remedial purposes," and that "[t]he statute's 'remedial purposes' are nowhere more evident than in the provision of a private action for those injured by racketeering activity." *Sedima,* 105 S.Ct. at 3286; *see also, Turkette,* 452 U.S. at 587, 101 S.Ct. at 2530. In this spirit, those sympathetic to a private equitable remedy under civil RICO have suggested two other readings of the statute. The Church urges us to adopt either or both of these constructions of section 1964.

First, the Church suggests that it is significant that the treble damage clause of section 1964(c) is preceded by "and" rather than "to." Thus, it is suggested, all appropriate relief, including the equitable remedies of part (a), are available to private plaintiffs because there is no clear statutory limitation. Moreover, the Church argues, there is no good reason for Congress denying victims equitable relief while permitting them damages relief. *See* Blakey, *The RICO Civil Fraud Action in Context: Reflections on Bennett v. Berg,* 58 Notre Dame L.Rev. 237, 332 (1982); Blakey and Gettings, *Racketeer Influenced and Corrupt Organizations (RICO): Basic Concepts—Criminal and Civil Remedies,* 53 Temple L.Q. 1014, 1038 n. 133 (1980). No court has accepted this reading. Indeed, two courts have been vehement in their rejection of this analysis. *See Sedima,* 741 F.2d at 489 n. 20 ("rather remarkable argument"); *Kaushal,* 556 F.Supp. at 582 ("bizarre and wholly unconvincing as a matter of plain English and the normal use of language."). *See also infra* note 11.

Second, the Church asserts that the variation in language used in parts (a) and (b) of section 1964 indicate that Congress did not intend to limit the inherent powers of federal courts to grant equitable relief in suitable cases. The argument is made that because part (b) grants the Attorney General the express power to seek *temporary* equitable relief, other parties are permitted to seek *permanent* equitable relief. Moreover, the Church contends, if the availability of equitable relief under section 1964 were determined solely by part (b), part (a) would become superfluous. *See* J. Fricano, *Civil RICO—An Antitrust Plaintiff's Considerations,* in *1 Current Problems in Federal Civil Practice* 827–28 (PLI, 1983); *Chambers,* 590 F.Supp. at 1540.

The Church develops this textual argument with particular vigor. It argues that part (a), alone of the subparts of section 1964, is general in theme and apparently unrestricted in application. Its plain words place no limit on the class or category of litigants who might avail themselves of the remedies it makes available under RICO. While the other subparts of section 1964 provide for specific relief to specific parties, the Church observes that they give no indication that part (a) is anything other than a simple and broad grant of jurisdiction. *See* Belgard, *Private Civil RICO Plaintiffs Are Entitled to Equitable Relief under § 1964(a),* 2 RICO Law Rep. 537, 537–38 (1985). The Church reads section 1964(b) as permission for the government to secure injunctive relief without satisfying the traditional equity tests of irreparable harm and inadequacy of alternative remedy at law. *See United States v. Cappetto,* 502 F.2d 1351, 1358–59 (7th Cir.1974), *cert. denied,* 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975). Thus, the Church asserts, part (b) does not restrict RICO injunctive relief to the government, but merely sets aside for civil RICO cases the traditional rule that only a victim may enjoin a crime. *See In re Debs,* 158 U.S. 564, 582–84, 15 S.Ct. 900, 905–06, 39 L.Ed. 1092 (1895). Thus, the Church would have us read part (a) as sufficient for a

federal court to grant an injunction to a private RICO plaintiff even if part (c) had never been added to section 1964.

This latter construction of section 1964 is certainly a plausible reading of the statutory language. However, our review of Congress' intent in enacting civil RICO convinces us that the Church is incorrect. The legislative history mandates us to hold that injunctive relief is not available to a private party in a civil RICO action. The Supreme Court's apparent endorsement of the conclusion that we reach here reinforces this reading of the statute. *See Sedima,* 105 S.Ct. at 3280 ("The civil remedies in the bill passed by the Senate, S. 30, were limited to injunctive actions by the United States and became §§ 1964(a), (b), and (d).").

### D.

RICO has a long legislative lineage. The Organized Crime Control Act of 1970 was derived from S. 30, 91st Cong., 1st Sess., 115 Cong.Rec. 769 (1969). Title IX of the Act, RICO, was added to S. 30 by the Senate. The substance of Title IX was contained in an earlier Senate bill, S. 1861, 91st Cong., 1st Sess., 115 Cong.Rec. 9,568–71 (1969). *See also* 116 Cong.Rec. 591 (remarks of Sen. McClellan). Neither S. 1861 nor S. 30 contained a private civil cause of action. An earlier predecessor of RICO, S. 1623, 91st Cong. 1st Sess., 115 Cong.Rec. 6,995–96 (1969), did contain a private civil cause of action based closely on the Clayton Act, providing explicitly for injunctive relief as well as for treble damages. S. 1623 §§ 3(c), 4(a). That bill was itself patterned on two earlier Senate bills, S. 2048 and S. 2049, 90th Cong. 1st Sess. (1967), both of which provided for private civil action similar to that in S. 1623. *See generally,* Belgard, 2 RICO Law Rep. at 538 (quoting relevant provisions of these bills).

The Senate Subcommittee on Criminal Laws and Procedures of the Senate Committee on the Judiciary replaced S. 1623 with S. 1861 apparently in part because S. 1861 provided broader governmental civil relief, such as the investigative demand, and was in other ways a more comprehen-

sive bill. *See Hearings on Measures Relating to Organized Crime Before the Subcommittee on Criminal Laws and Procedures of the Senate Committee on the Judiciary,* 91st Cong., 1st Sess. 387–88, 407–08 (1969).

There were also a number of House predecessors to RICO which paralleled S. 30. *See* H.R. 19215, 91st Cong.2d Sess. 116 Cong.Rec. 31,914 (1970). H.R. 19215 included a more complete private cause of action section than that eventually inserted by the House, and explicitly allowed for private party injunctive relief.

While the Act for the most part originated in the Senate, the civil RICO provision permitting suit by private persons, 18 U.S.C. § 1964(c), originated in the House. *See Sedima,* 105 S.Ct. at 3280. During hearings on S. 30 before the House Judiciary Committee, Representative Steiger proposed the addition of a private treble damages action "similar to the private damage remedy found in the antitrust laws.... [T]hose who have been wronged by organized crime should at least be given access to a legal remedy. In addition, the availability of such a remedy would enhance the effectiveness of title IX's prohibitions." *Organized Crime Control: Hearings on S. 30, and related proposals, before Subcommittee No. 5 of the House Committee on the Judiciary,* 91st Cong., 2d Sess. 520 (1970) (*"House Hearings"*). The American Bar Association also proposed an amendment "based upon the concept of Section 4 of the Clayton Act." *Id.* at 543–44, 548, 559; *see* 116 Cong.Rec. 25,190–91 (1970); *Sedima,* 105 S.Ct. at 3280–81.

Significantly, Representative Steiger's proposal, like those in the rejected Senate bills, provided explicitly for a private injunctive remedy under section 1964(a). *House Hearings* at 521 (subsection (c) of proposal of Rep. Steiger). The legislative history is silent as to why the subcommittee rejected this language and explicitly created *only* the private action for treble damages which was eventually enacted as section 1964(c). *See* 116 Cong.Rec. 25,190 (remarks of Sen. McClellan welcoming

House addition of private treble damages remedy). The adopted statutory language was drawn from H.R. 19586, 91st Cong., 2d Sess. 56 (1970), one of the two House bills that paralleled S. 30. In choosing H.R. 19586 over H.R. 19215, the House apparently explicitly rejected a private injunctive relief provision.

### E.

The Church's argument rests on the assertion that the private treble damages remedy provided by section 1964(c) is *additional* to the equitable RICO remedies made available to private plaintiffs by section 1964(a). The legislative history offers some support for this thesis. Introducing the bill during House debate, the House sponsor, Representative Poff, stated:

> Courts are given broad powers under the title to proceed civilly, using essentially their equitable powers, to reform corrupted organizations, for example, by prohibiting the racketeers to participate any longer in the enterprise, by ordering divestitures, and even by ordering dissolution or reorganization of the enterprise. *In addition*, at the suggestion of the gentleman from Arizona (Mr. Steiger) and also the American Bar Association and others, the committee has provided that private persons injured by reason of a violation of the title may recover treble damages in Federal courts—another example of the antitrust remedy being adapted for use against organized criminality.

116 Cong.Rec. 35,295 (1970) (emphasis added). Earlier, during Senate floor debate on the bill before the addition of the present section 1964(c), Senator McClellan, the bill's principal Senate sponsor, described the value of civil RICO thus:

> Since enactment of the Sherman Antitrust Act in 1890, the courts have used several equitable remedies ... to implement the language of 15 U.S.C. sections 1 and 2. I believe, and numerous others have expressed a similar belief, that these equitable devices can prove effective in cleaning up organizations corrupted by the forces of organized crime.

*Id.* at 592.

However, two separate episodes from the history of civil RICO's legislative passage convince us that the conclusions the Church would have us draw from these congressional statements do not reflect Congress' intent in section 1964. *First*, the House rejected an amendment, described as "an additional civil remedy," which would expressly permit private parties to sue for injunctive relief under section 1964(a). *Second*, in the very next year after RICO's enactment, Congress refused to enact a bill to amend section 1964 and give private plaintiffs injunctive relief.

During debate on the House floor, Representative Steiger offered an amendment that would have allowed private injunctive actions, fixed a statute of limitations, and clarified venue and process requirements. 116 Cong.Rec. at 35,346; *see also id.* at 35,227–28.[9] The proposal was greeted with some hostility because it had not been re-

9. Representative Steiger's amendment was very specific. The present section 1964(c), the private treble damages remedy, which the House had already agreed to add to the bill, and the present part (d), concerning collateral estoppel, would become parts (e) and (g) respectively of section 1964. 116 Cong.Rec. at 35,346. The new part (c) proposed by Representative Steiger read:

> (c) Any person may institute proceedings under subsection (a) of this section. In any proceeding brought by any person under subsection (a) of this section, relief shall be granted in conformity with the principles which govern the granting of injunctive relief from threatened loss or damages in

other cases. Upon the execution of proper bond against damages from an injunction improvidently granted and a showing of immediate danger of irreparable loss or damage, a preliminary injunction may be issued in any action before a determination thereof upon its merits.

*Id.* A new part (d) would permit the government to sue for damages; proposed part (f) would allow government intervention in private suits of "general public importance"; and proposed part (h) provided for a five year statute of limitations tollable during the pendency of a government or private suit on a similar matter. *Id.*

viewed in committee, and Representative Steiger *withdrew it without a vote being taken. Id.* at 35,346–47. Representative Steiger's withdrawal was in response to remarks by the bill's House sponsor. Representative Poff stated:

> Mr. Chairman, I want to pay special tribute to the gentleman in the well for having raised the issue which his amendment defines. *It does offer an additional civil remedy* which I think properly might be suited to the special mechanism fashioned in title IX. Indeed, I am an author of an almost identical amendment. *It has its counterpart almost in haec verba in the antitrust statutes,* and yet I suggest to the gentleman that prudence would dictate that the Judiciary Committee very carefully explore the potential consequences that this new remedy might have in all the ramifications which this legislation contains and for that reason, I would hope that the gentleman might agree to ask unanimous consent to withdraw his amendment from consideration with the understanding that it might properly be considered by the Judiciary Committee when the Congress reconvenes following the elections or some other appropriate time.

*Id.* at 35,346 (emphasis added). The House then passed the bill, with the treble damages provision in the form recommended by the Committee. *Id.* at 35,363–64. The Senate did not seek a conference and adopted the bill as amended in the House. *Id.* at 36,296.

In the next term of the Senate, the same amendment as that offered by Representative Steiger on the House floor during debate on the RICO bill, *see supra* note 9, was proposed as a bill to amend the now enacted legislation. S. 16, 92nd Cong., 1st Sess. (1971). *See Victims of Crime, Hearing before the Subcommittee on Criminal Laws and Procedures of the Senate Committee of the Judiciary,* 92nd Cong., 1st Sess. 3 (1972). The new bill "would expand

the available civil remedies" since *"[n]ow only the United States can institute injunctive proceedings." Id.* at 158. (Statement of Richard Velde, Associate Administrator, Law Enforcement Assistance Administration) (emphasis added).[10]

The Senate Judiciary Committee reported favorably on S. 16, 92d Cong., 2d Sess., 118 Cong.Rec. 29,368–69 (1972). The committee report noted that RICO as enacted, provided for private treble damages actions, and that the new bill would supplement this and *"authorize private injunctive relief* from racketeering activity." S.Rep. No. 1070, 92d Cong., 2d Sess. 10 (1972) (emphasis added). During Senate floor debates on S. 16, Senator McClellan observed that the bill would add to existing private RICO remedies by "authoriz[ing] *private injunctive relief* from racketeering activity." 118 Cong.Rec. 29,370 (1972). *See also id.* (remarks of Senator Hruska). Although the Senate passed S. 16, the bill never passed the House, and its substance never became law.

The clear message from the legislative history is that, in considering civil RICO, Congress was repeatedly presented with the opportunity *expressly* to include a provision permitting private plaintiffs to secure injunctive relief. On each occasion, Congress *rejected* the addition of any such provision.

### F.

This clear message is reinforced by recalling that civil RICO was intended to provide a private cause of action modeled on the analogous provision of the antitrust laws. *See* 116 Cong.Rec. 592 (remarks of Sen. McClellan); *id.* at 602 (remarks of Sen. Hruska) (RICO's civil provisions employ "time-tested antitrust remedies"); S.Rep. No. 617, 80–82, 125, 160 (1969) U.S. Code Cong. & Admin.News 1970, p. 4007; 116 Cong.Rec. 35,295 (Private treble damages provision is "another example of the antitrust remedy being adapted for use

---

**10.** While post-enactment legislative history is not by any means conclusive, it cannot merely be ignored. *North Haven Board of Education v.*

*Bell,* 456 U.S. 512, 530–35, 102 S.Ct. 1912, 1922–25, 72 L.Ed.2d 299 (1982).

against organized criminality.") (remarks of Rep. Poff); *House Hearings* at 543–44 (testimony of ABA President Wright); *Sedima,* 105 S.Ct. at 3282 ("The clearest current in [the legislative] history is the reliance on the Clayton Act model....").

The language of the treble damages antitrust remedy, section four of the Clayton Act, 15 U.S.C. § 15(a), is similar to that of civil RICO.[11] The Supreme Court has explicitly held that the language of section 4 *precludes* private injunctive relief. *See Paine Lumber Co. v. Neal,* 244 U.S. 459, 471, 37 S.Ct. 718, 719, 61 L.Ed. 1256 (1917). *Cf. Minnesota v. Northern Securities Co.,* 194 U.S. 48, 70–71, 24 S.Ct. 598, 604–605, 48 L.Ed. 870 (1904) (no private right to injunctive relief under section 4 of Sherman Act). Private antitrust plaintiffs can, however, secure injunctive relief only by virtue of a separate section of the Clayton Act which expressly provides for private equitable actions. *See* Section 16 *codified at* 15 U.S.C. § 26.[12] RICO contains no parallel provision to section 16's grant of a private right to injunctive relief.

Presumably, had it desired to do so, Congress could have completed the analogy between civil RICO and the antitrust laws by including in civil RICO a private equitable relief remedy like section sixteen of the Clayton Act. That it did not do so, despite the repeated efforts of several members of Congress, strongly suggests that Congress did not intend to give private civil RICO plaintiffs access to equitable remedies.[13]

### G.

Further support for the conclusion that injunctive relief is not available under civil

---

**11.** 15 U.S.C. § 15(a) provides in pertinent part: "[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, *and* shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." (Emphasis added.)

It should be noted that this provision includes the word "and" before stating the remedy. It was the inclusion of this word in civil RICO that prompted the Church and some commentators to conclude that civil RICO permitted private injunctive relief. *See supra* page 1083. The fact that the Clayton Act treble damages provision does *not* extend to private injunctive relief, even with the "and" included, surely undermines the argument that its inclusion in section 1964(c) indicates that injunctive relief is not precluded by that section.

**12.** 15 U.S.C. § 26 provides in pertinent part: Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction im-

providently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue. A proviso to this section prevents an equitable suit against a common carrier.

**13.** The Church argues that comparisons with section 16 of the Clayton Act are inappropriate because the Clayton Act also includes a provision, section 15, 15 U.S.C. § 25, expressly limiting injunctive relief to the government and thus the statutes—RICO and the Clayton Act—are not similar. *See* Belgard, 2 RICO Law Rep. at 541, n. 13. *See also* Fricano, *Civil RICO* at 828–29. This argument is to no avail. The legislative history shows that Congress recognized and accepted the validity of the comparison during the passage of RICO.

In his remarks on the House floor which prompted Representative Steiger to withdraw his late amendment specifically providing injunctive relief to a private RICO plaintiff, Representative Poff stated that Representative Steiger's amendment "has its counterpart almost in haec verba in the antitrust statutes." 116 Cong. Rec. 35,346. *See supra* page 1086. Representative Poff must have been comparing Representative Steiger's abortive private injunctive relief provision to section 16 of the Clayton Act, the private antitrust injunctive relief provision. Thus, Congress was well aware that civil RICO was not symmetrical with the antitrust laws with respect to private injunctive relief. Congress' rejection of Representative Steiger's amendment is additional proof that Congress deliberately and knowingly excluded private injunctive relief from the arsenal of remedies created by RICO.

RICO is found in the Supreme Court doctrine that sharply limits the implication of causes of action or remedies not expressly provided by statute.

> [I]t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it.

*Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 19, 100 S.Ct. 242, 247, 62 L.Ed.2d 146 (1979); *see also Touche Ross & Co. v. Redington,* 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979).

Where a statute provides an elaborate enforcement scheme that confers authority to sue on both government officials and private citizens, "it cannot be assumed that Congress intended to authorize by implication additional judicial remedies for private citizens." *Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1, 14, 101 S.Ct. 2615, 2623, 69 L.Ed.2d 435 (1981). "In the absence of strong indicia of a contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate." *Id.* at 15, 101 S.Ct. 2623. *Compare Sea Clammers* (no private right of action implied in federal environmental statutes) *with Herman & MacLean v. Huddleston,* 459 U.S. 375, 380–87, 103 S.Ct. 683, 686–90, 74 L.Ed.2d 548 (1983) (implied remedy under securities law available because of congressional intent even where cumulative to express remedies).

For civil RICO, there are strong indicia of congressional intent *against* any implied injunctive relief remedy. Similarly, there is *no indication* in the language of section 1964 that civil RICO was not intended, as its plain wording states, to limit private plaintiffs only to damages, costs, and fees. Taken together, the legislative history and statutory language suggest overwhelmingly that no private equitable action should be implied under civil RICO.[14]

### H.

Thus we conclude that Congress did not intend to give private RICO plaintiffs any right to injunctive relief. In reaching this conclusion, we recognize that strong policy arguments can be made to support a right to injunctive relief for private RICO plaintiffs.

It may be that in drawing the line between private equitable relief and private damages, Congress wished to preclude federal courts from interfering with the day-to-day running of businesses at the behest of what might be only a disgruntled competitor. However, this same concern about anticompetitive litigation has been frequently leveled at RICO's treble damages provision. The Supreme Court, despite expressing sympathy for this concern, has rejected it as not consistent with the statute's wording and history. *See Sedima,* 105 S.Ct. at 3277–78.

In contrast, we recognize the force of the Church's argument that a private injunctive remedy would permit an injured party to put an immediate stop to racketeering behavior that threatens his or her business

---

**14.** The Church argues that a more appropriate test whether civil RICO implies a private right is that articulated in *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975). *See* Belgard, 2 RICO Law Rep. at 539. *Cort* posed four "relevant" questions to assist in determining "whether a private remedy is implicit in a statute not expressly providing one." *Cort,* 422 U.S. at 78, 95 S.Ct. 2088. We see no conflict between *Cort* and the more recent line of Supreme Court cases upon which we rely. Applying the *Cort* factors still produces a ruling adverse to the Church. First, the Church is not "one of the class for whose *especial* benefit the statute was enacted." *Id.* (emphasis in original).

RICO was aimed principally at protecting the public from organized crime front enterprises, not at enabling a religious organization to prevent the dissemination of doctrinal materials by a rival religious organization. Second, as we have discussed *supra,* there is substantial "indication of legislative intent, explicit and implicit" against an implied private remedy. *Id.* Third, while implying an injunctive remedy may be consistent generally with RICO's purpose, in this particular case, we doubt whether this is so. *Id.* Fourth, to the extent that the dispute here concerns trade secrets misappropriation, "it would be inappropriate to infer a cause of action based solely on federal law." *Id.*

with economic destruction before the business has been brought to its knees. While the treble damages remedy is a potent weapon, it necessarily assumes that economic injury has occurred. The preventive effect of injunctive relief is often a more just remedy. Although civil RICO empowers the government to bring an injunctive suit to protect a threatened enterprise, we recognize that the resources of the United States Attorney's office are limited. Civil RICO deliberately created dual avenues of enforcement—private and public. We recognize that precluding enforcing parties from employing the weapon of equitable relief partially hamstrings the statute's effect. "Private attorney general provisions such as § 1964(c) are in part designed to fill prosecutorial gaps," *Sedima*, 105 S.Ct. at 3284, and use of equitable remedies by private parties would frequently result in substantial benefits to society generally. These broad social benefits, such as the dismantling of an illegitimate enterprise, would generally exceed the gain to the private plaintiff from this action, especially where the individual's injury has been ameliorated by treble damages.

Even so, while, on balance, it may well have been desirable for Congress to have extended to private parties the right to injunctive relief under civil RICO, we are convinced that Congress chose not to do so, and we must respect and follow that judgment.[15]

**II. Can Religious Materials Constitute a Protectible Trade Secret?**

The Church's complaint included several pendent California state law claims, including misappropriation of trade secrets. Even though the Church is not entitled to injunctive relief under RICO, we must also decide whether it is entitled to the same relief under state law. *See USACO*, 689 F.2d at 97–98 (affirming on state law grounds an injunction which district court had issued where RICO provided the jurisdictional base).

■ "The maintenance of standards of commercial ethics and the encouragement of invention are the broadly stated policies behind trade secret law." *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 481, 94 S.Ct. 1879, 1886, 40 L.Ed.2d 315 (1974); *Chicago Lock Co. v. Fanberg*, 676 F.2d 400, 404–05 (9th Cir.1982). States may regulate trade secrets only to the extent that state law does not conflict with federal copyright and patent laws. *Kewanee*, 416 U.S. at 479, 94 S.Ct. at 1885. We review matters of state law *de novo*. *McLinn*, 739 F.2d at 1403.

Before 1985, California trade secrets law was based on *Restatement of Torts* § 757, comment (b) (1939). The leading California case prior to the present legislation adopted verbatim the Restatement's definition of trade secret:

It is now settled that a trade secret may consist of any formula, pattern, devise or

---

**15.** Since the remedy granted to the Church by the district court was beyond the jurisdiction of the court, it is not necessary for our resolution of this appeal to reach the additional jurisdictional questions whether the Church had standing to assert its adherents' "religious injury" caused by the new church's alleged conduct and whether the dispute was ripe for resolution by the court. *See Liberty National Insurance Holding Co. v. Charter Co.*, 734 F.2d 545, 553 n. 19 (11th Cir.1984); *Raypath, Inc. v. City of Anchorage*, 544 F.2d 1019, 1021 (9th Cir.1976) (per curiam) (if no cause of action can exist, the case should be dismissed before reaching the issue of standing).

By resolving this appeal on jurisdictional grounds we avoid deciding the significant first amendment issues raised by the district court's injunction. For example, the effect of the in-

junction's prohibition on the use of any of the higher level materials is to curtail the religious practice of the new church's adherents. *See Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). Similarly, the court's review of the Church's stolen materials and the new church's documents to determine whether essential elements have been appropriated raises the potential for impermissible entanglement in matters of religious doctrine. *See Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976). Further, the court's recognition of "religious injury" from premature unsupervised exposure to Church materials as irreparable harm justifying an injunction prompts worrisome establishment concerns. *See Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).

compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. *Sinclair v. Aquarius Electroncis, Inc.*, 42 Cal.App.3d 216, 221, 116 Cal.Rptr. 654, 658 (1974) (emphasis omitted); *see also Chicago Lock*, 676 F.2d at 404; 7 B. Witkin, *Summary of California Law*, Equity § 82 (8th ed. 1974 and Supp.1984). The *Restatement (Second) of Torts* omitted section 757 and any reference to trade secrets. In response, a Uniform Trade Secrets Act was drafted. California adopted this uniform Act, with minor changes, in 1985. *See* 14 U.L.A. 537, 538–40 (1980 and 1985 Supp.); M. Jager, *Trade Secrets Law*, § 3.04 (1985); 3 R. Milgrim, *Milgrim on Trade Secrets* App. AA (1985).[16]

California law now defines a trade secret as:

information, including a formula, pattern, compilation, program, devise, method, technique, or process, that:

(1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal.Civ.Code § 3426.1(d) (West Supp.1986).

The district court held that the Church's higher level materials were a trade secret. The court relied heavily on the Church's concededly elaborate efforts to maintain the secrecy of its materials. However, the Church's contention that the disputed materials are "religious scripture" was not reconciled with the California statute's reference to "economic value" as an element of a protectible trade secret.

To be protectible as a trade secret under either Restatement section 757 or the new California statute, the confidential material must convey an actual or potential *commercial* advantage, presumably measurable in dollar terms. We do not accept that a trade secret can be based on the *spiritual advantage* the Church believes its adherents acquire over non-adherents by using the materials in the prescribed manner. Former Restatement § 757 defines trade secrets as information which is *"used in one's business,* and which gives him an opportunity to obtain an *advantage over competitors* who do not know or use it." (Emphasis added). *See also* 1 Milgrim § 2.02 ("An element common to the definitions [of trade secret] is actual use of the secret *in a trade or business.* ") (emphasis added); Klitzke, *Trade Secrets: Important Quasi-Property Rights*, 41 Bus.Lawyer 555, 559 (1986) ("Information that can have no commercial value cannot be the subject of trade secret protection."); Commissioners' Comment to § 1 of Uniform Act, 14 U.L.A. at 543 ("The definition includes information that has *commercial value* from a negative viewpoint.... [A] trade secret need not be exclusive to confer a *competitive advantage....*") (emphasis added).

No published California decision has yet construed Civ.Code § 3426.1(d)'s definition of trade secret. In the only significant effort by any state court to construe the Uniform Act's definitional reference to "independent economic value," the Minnesota Supreme Court stated: "This statutory element carries forward the common law requirement of *competitive advantage.* ... This does not mean ... that the owner of the trade secret must be the only one in *the market.* ... If an outsider would obtain *a valuable share of the market* by gaining certain information, then that information may be a trade secret if it is not known or readily ascertainable." *Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 900 (Minn.1983) (emphasis added). We think it probable that the California courts will follow the Minnesota Supreme Court's view because of the wording of the California criminal law equivalent of Civ.Code § 3426.1(d). Cal.Penal Code § 499c(a)(9) (West Supp.1986) states:

---

**16.** Because the new church's alleged trade secrets' misappropriation spanned the effective date of the California statute, both old and new law must be applicable to sustain the injunction. *See* Cal.Civ.Code § 3426.10.

" 'Trade secret' means ... information ... which is secret and which is not generally available to the public, *and which gives one who uses it an advantage over competitors* who do not know of or use the trade secret." (Emphasis added) *See People v. Serrata*, 62 Cal.App.3d 9, 22, 133 Cal.Rptr. 144, 152 (1976) ("The phrase 'advantage over competitors' [in Cal.Pen.Code § 499c] refers to any form of *commercial advantage.*" (emphasis added)).

In its supplementary findings of fact, the district court noted that the new church offers its services to its adherents at a price "substantially less than that charged by the Church." However, the Church alleged no competitive market advantage from maintaining the secrecy of its higher level materials. Indeed, to do so would raise grave doubts about its claim as a religion and a not-for-profit corporation. Rather, the Church alleges that its precepts require adherents to be audited in a structured manner with exposure to higher level materials only when the auditor considers the adherent ready. The injury inflicted on the Church by the new church's misappropriation of its "secret" is the "religious harm" that would be suffered by Church adherents from premature unsupervised exposure to the materials. The value of the confidential materials is thus spiritual not commercial, and the materials cannot be said to have the "independent economic value" necessary to qualify as a protectible trade secret.[17]

### III. *Conclusion*

The Church was not entitled to an injunction either under civil RICO or under California trade secrets law. We therefore dissolve the injunction forthwith.

REVERSED.

---

17. The Church relies heavily on language in *Purcell v. Summers*, 145 F.2d 979, 985 (4th Cir. 1944) which states that unfair competition law applies fully to religious and not-for-profit organizations. That case involved an injunction under South Carolina law for the improper use of a church's name by a splinter church. The Methodist Episcopal Church South had merged with two other churches to form the United Methodist Church. Dissident members who opposed the merger formed their own church using the former name. The Fourth Circuit held that the property and charitable gifts of the merged church would be threatened by the use of its former name by a different church.

*Purcell* does not involve trade secrets. Rather, it is an example of "the common law of trademark infringement and unfair competition [which] is replete with cases holding that benevolent, religious, charitable or fraternal organizations are entitled to injunctive relief protecting against the continued use of their name by local chapters which disaffiliate." *United States Jaycees v. San Francisco Junior Chamber of Commerce*, 354 F.Supp. 61, 71 (N.D.Cal.1972) (citing numerous cases), *aff'd* 513 F.2d 1226 (9th Cir. 1975) (per curiam).