**TOWN OF WEST HARTFORD, a municipal corporation located in Hartford County, State of Connecticut**

v.

**OPERATION RESCUE; Joseph M. Scheidler; Randall A. Terry; Project Life, Inc.; Connecticut Pro–Life Action Network; John Kladde; John Charles Grant; Eileen M. Haggerty; Jean Pollock; Spear Printing Co., Inc.; John M. Spear; Catherine A. Jersey; Maria D. Garvey; Lillian A. Loughlin; William Calvin; William P. Cotter; Hjalmar Syversen; Faithful and True Roman Catholics; John Doe(s); and Jane Doe(s).**

Civ. No. H–89–400 (PCD).
United States District Court,
D. Connecticut.
Sept. 21, 1989.

Marjorie S. Wilder, Patrick G. Alair, Asst. Corp. Counsel, Town of West Hartford, West Hartford, Conn., for plaintiff.

George J. Mercer, Groton, Conn., Anthony Slez, Jr., Westport, Conn., pro hac vice for Operation Rescue, Randall Terry and Project Life, Inc.

Pamela Hershinson, Jon L. Schoenhorn, Hartford, Conn., for intervening plaintiff.

Amy J. Greenberg, Bridgeport, Conn., for Summit Women's Center, Inc.

Desiree M. Jones, Bodell & Gross, Madison, Conn., for Randall Terry.

James Altham, Hamden, Conn., for Eileen M. Haggerty, Jean Pollock, Spear Printing Co., Inc., and John M. Spear.

Vincent P. McCarthy, New Milford, Conn., for Jean Pollock, Spear Printing Co., Inc., John M. Spear, Catherine A. Jersey, Lillian A. Loughlin, and William Calvin.

Joseph P. Secola, Milford, Conn., for Operation Rescue, Joseph M. Scheidler, Randall A. Terry, and non-party Anthony J. Nania.

### RULING ON MOTION FOR PRELIMINARY INJUNCTION

DORSEY, District Judge.

This action relates to anti-abortion protests on April 1 and June 17, 1989 at the Summit Women's Center ("Center") in West Hartford, Connecticut. The Center is a Connecticut corporation which provides gynecological care, abortion procedures, and other medical services in West Hartford.[1] Defendants are alleged to be anti-abortion activists who have participated in those protests. Plaintiff, Town of West Hartford (the "Town"), alleges that defendants sought by unlawful means to preclude the Center from performing abortions and to prevent the Town from diligently and effectively rendering municipal services, including the enforcement of the law, particularly at the lowest possible cost. The Town seeks damages, declaratory and injunctive relief under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.;* 42 U.S.C. § 1985; Conn.Gen.Stat. § 46a–58(a); and the common law of conspiracy, negligence and public nuisance.

This memorandum shall serve as the court's findings of fact and conclusions of law under Fed.R.Civ.P. 52(a).

#### I. *Findings of Fact*

1. The Center is a women's health care facility located on the third floor of an office building within a shopping center at 345 North Main Street, West Hartford. The Center provides medical services, including abortions, to women.

2. On April 1 and June 17, 1989, the Center was the scene of large-scale anti-abortion demonstrations. Large numbers of protesters picketed and distributed leaflets outside the building, but moved to public property when requested. They approached women headed for the Center seeking to dissuade them from the Center and particularly from undertaking abortions. The approaches were forceful and persistent.

3. On each date, a large number of persons, including some defendants, entered and/or blocked the offices of the Center without permission, for the purpose of closing down the Center and preventing and discouraging abortions.[2]

4. Entry to the Center was gained by rescuers posing as patients who opened the doors for the entire group of rescuers. On June 17, rescuers simply pushed past a

---

1. The Center's motion to intervene was granted August 28, 1989, after the preliminary injunction hearing. Preliminary relief is here considered only as a question of entitlement of the original plaintiff, the Town of West Hartford.

2. The term "rescuers" distinguishes these persons from demonstrators who neither entered nor blocked the offices of the Center.

Center employee who tried to prevent their entry.

5. On April 1, seventy-five to eighty rescuers arrived at about 7:45 a.m. and entered the Center shortly afterward. The last rescuer was not removed from the Center office until about 6:00 p.m. In June, over two hundred rescuers arrived at the Center about 7:30 a.m. and were not removed until 7:00 p.m. None of the rescuers had any lawful purpose, permission, nor reason for being in the Center offices.

6. On each occasion the rescuers were ordered to leave the premises by employees of the Center, an employee of the owner of the building, and the West Hartford police. The orders were ignored. Rescuers ensconced themselves throughout and outside the Center offices, obstructing access to treatment and recovery rooms and to the Center itself. Some door locks were forced, including some by police and firemen, and equipment was damaged. Elevators in the building were disabled and fire exists blocked.

7. On April 1, patients with appointments at the Center had to "run a gauntlet" of rescuers to enter the clinic and treatment rooms. They were entreated to "repent" and to save their souls by declining an abortion. Some patients were delayed by the obstructions. In June, the rescuers on the premises were so numerous and obstructive that the Center was unable to treat any patients. Twenty-five to thirty-five patients did not show for appointments, many explicitly because of the protest. Patients who did appear were late. Scheduled but uncompleted procedures included gynecological exams, dispensing of medications, and abortions.

8. Offices of others in the building, including medical and dental practitioners, during both the April and June incidents, were obstructed and patients unrelated to the Center were unable to enter to obtain necessary treatment.

9. Some of the Center's employees were intimidated by the invasions. On June 17, a receptionist suffered from an anxiety attack. Four employees quit, giving fear of the protests as a reason.

10. Approximately forty West Hartford police officers responded to the scene on both dates. The department's total strength is about one hundred twenty-five. An ambulance and paramedics under contract to the Town were stationed at the Center during the protests and at the court where the arrestees were processed. In addition, the fire department was called to free five rescuers who had locked themselves together inside the Center.

11. On April 1, sixty-one persons were arrested on charges of criminal trespass, interfering with a police officer, and refusal to be processed. The latter charges arose from the arrestees' "passive resistance"—a refusal to walk after their arrest and to provide identification. The arrestees carried no identification. Defendants John Charles Grant, Catherine A. Jersey, and Hjalmar Syversen were arrested on April 1 for trespassing on the Center's property. On June 17, two hundred sixty-one persons were arrested on similar charges, including defendants William P. Cotter, John Charles Grant, Catherine Jersey, and Hjalmar Syversen. The procedure used by the police to identify these defendants was accurate. The defendants who were arrested for trespassing were, apparently, participating in an organized, intentional and criminal trespass on the property of the Center.

12. The demonstration and rescue was organized, prepared, and orchestrated. The rescuers arrived together and carried no identification. Upon arrest, they adopted a uniform posture, going limp, refusing to walk or cooperate with the arresting officers. On April 1, five rescuers locked themselves together with locks. Some of those detained appear to have exchanged clothes to hamper identification.

13. On each day, from among the demonstrators, one or more persons presented themselves to officials as "negotiators" authorized to speak for the arrestees. The arrestees responded to instructions from negotiators. On April 1, a person identified only as "Bill" acted in this capacity. At arraignment, "Bill" told the arrestees that they could provide identification and

be released if they wished, but reminded them of their commitment to refuse identification and remain in custody and requested they do so. He obtained the identification documents of those who wished to be released and supplied a single address and telephone number for all the arrestees.

14. "Bill" was requested to obtain keys to free the rescuers who had locked themselves together. "Bill" offered to speak to the "leaders." After appearing to have done so, he offered the keys if the charges against all arrestees were reduced to misdemeanors. When a meeting with the protest leaders was requested, "Bill" returned with defendant Kladde, who also offered the keys if the charges were reduced and stretchers were used to remove the arrestees. Kladde also offered a nurse to monitor the rescuers.

15. William Calvin functioned as the negotiator on June 17. William Cotter was observed in Quincy, Massachusetts, organizing and directing persons into cars to attend a protest. The convoy of cars were followed to Auburn, Massachusetts. Later that day, Cotter was arrested for trespassing at the Center.

16. There appears to be a substantial association of people who are committed to eliminating the availability of abortions. The association appears to be loose and not formed. Thus, groups have associated under the names "Operation Rescue," "Connecticut Pro–Life Action Network," and "Faithful and True Roman Catholics." Except for Pro–Life, Inc., none is shown to have a legal status. While Randall Terry has written the "bible" for rescuers and proclaims a role in "Operation Rescue," a banner which was shown to have been used by rescuers in the West Hartford incidents did not reveal him to have had a personal role in either incident. Neither has any other association been shown to have had a direct or immediate role in either incident. A number of the rescuers, including arrestees, by wearing the name and/or emblem "Operation Rescue" have adopted that name for their conduct and activity on April 1 and June 17.

17. Defendants Kladde, Grant, Jersey, Calvin, Cotter, Syversen, Loughlin and Pollock were all shown to have been personally involved as rescuers. Defendant Loughlin was arrested for her activity. She testified that she came merely to picket and not to be arrested. In support of her limited role, she claimed to have had ample identification in a bag she was carrying; yet she did not claim to have given her name and the photographs of her arrest show no such bag. She is not credited on this regard. Defendant Pollock was not shown to have been arrested, but was shown to have exercised a leadership and organizational role in each demonstration. She did not testify in opposition. An individual named Haggerty was involved, but not clearly identified as Eileen Haggerty, the named defendant.

18. Rescues are indicated to be an ongoing activity. The Center has been shown to be a likely target for repetition of the demonstrations and rescues of April 1 and June 17.

## II. *Jurisdiction and Standing*

Defendants have raised the threshold issues of personal jurisdiction and plaintiff's standing to bring this action. The issue of subject-matter jurisdiction is raised by the court sua sponte.

### A. *Personal Jurisdiction*

■ Returns of service and/or acknowledgment of service by mail have been filed showing service on the following defendants:

Spear Printing Co. and
John Spear on .............July 20, 1989
Randall A. Terry and
Operation Rescue on .......July 25, 1989
William Calvin on ..........August 4, 1989
William Cotter on ..........August 10, 1989
John Kladde on ............August 10, 1989
Catherine A. Jersey on .....July 3, 1989
Joseph M. Scheidler on .....July 18, 1989

For purpose of the motion for preliminary injunction, the court may exercise personal jurisdiction only over those defendants upon whom service has been made. *See also* Fed.R.Civ.P. 65(a)(1) (injunction may not issue without notice); *SEC v. Capital Growth Corp.*, 391 F.Supp. 593, 600 (S.D. N.Y.1974).

## B. *Subject–Matter Jurisdiction*

■ Plaintiff's announced intention to withdraw its § 1985 claim, *see* Plaintiff's Post–Hearing Memorandum at 50, leaves the RICO claim as sole basis for federal jurisdiction over this action.[3] Defendants have challenged the applicability of civil RICO to the conduct alleged. Because of plaintiff's reliance on RICO, the issue of subject-matter jurisdiction will be discussed first. *See* Fed.R.Civ.P. 12(h)(3). Defendants have not moved to dismiss the RICO claim and, at this preliminary stage, the legal sufficiency of plaintiff's pleadings are not specifically at issue. To support federal jurisdiction, the complaint need only be " 'drawn so as to claim a right to recover under the Constitution and laws of the United States,' " which claim is not " 'wholly insubstantial and frivolous.' " *Jackson Transit Auth. v. Transit Union,* 457 U.S. 15, 21 n. 6, 102 S.Ct. 2202, 2206 n. 6, 72 L.Ed.2d 639 (1982), quoting *Bell v. Hood,* 327 U.S. 678, 681–83, 66 S.Ct. 773, 775–76, 90 L.Ed. 939 (1946).

Plaintiff claims that defendants have operated a RICO "enterprise," Operation Rescue, through a pattern of racketeering activity, including violations of the Hobbs Act, 18 U.S.C. § 1951. The "pattern of racketeering" alleged is the planning and carrying out of trespassory entries and occupations of the Center for the purpose of intimidating the Center, its patients and employees. The gravamen of plaintiff's complaint is that defendants seek by these occupations to extort from the Center its right and ability to conduct its activities and to extort from the Town its ability to protect the rights of the Center, its patients, and the Town's citizens. Plaintiff claims injury in the form of overtime expenses, injury to an employee, and interference with ability to provide police, fire and other emergency services to its citizens.

■ There is a basis for pendent jurisdiction. The federal and state claims derive from a "common nucleus of operative fact," the circumstances of the events at the Center on April 1 and June 17. *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 11, 16 L.Ed.2d 218 (1966). They are sufficiently interrelated that plaintiff "would ordinarily be expected to try them all in one judicial proceeding." *Id.* The exercise of pendent jurisdiction is discretionary, but a presumption favors exercising jurisdiction where it exists. *Miller v. Lovett,* 879 F.2d 1066, 1071–72 (2d Cir.1989). Although the court must exercise discretion as to pendent jurisdiction at every stage of the proceedings, *see Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 108 S.Ct. 614, 618, 98 L.Ed.2d 720 (1988), on the present record pendent jurisdiction exists and will be exercised over the state law claims. *Cf. State of New York v. Shore Realty Corp.,* 759 F.2d 1032, 1050 (2d Cir.1985) (existence of colorable federal claim authorizes federal court to hear state claims and grant injunction); *but see Gibbs,* 383 U.S. at 726, 86 S.Ct. at 1139 (where federal claims dismissed before trial, pendent claims ordinarily should be dismissed as well).

## III. *Availability of an Injunction Under RICO*

Defendants argue that injunctive relief is not available under RICO's civil provision, 18 U.S.C. § 1964.[4] Whether civil RICO

---

**3.** Although diversity jurisdiction has been alleged, the complaint on its face shows that complete diversity between the parties is lacking. *See* Complaint, ¶ 1 (plaintiff is a municipal corporation located in Connecticut); ¶¶ 7, 8, 9 (alleging Connecticut residence of defendants Kladde, Grant and Haggerty).

**4.** Section 1964 states:
(a) The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons. (b) The Attorney General may institute proceedings under this section. Pending final determination thereof, the court may at any time enter such restraining orders or prohibi-

provides injunctive relief to a private plaintiff has produced disagreement among courts which have addressed the question. *Religious Technology Center v. Wollersheim,* 796 F.2d 1076, 1081–88 (9th Cir. 1986), *cert. denied,* 479 U.S. 1103, 107 S.Ct. 1336, 94 L.Ed.2d 187 (1987) (no private injunctive relief); *Miller v. Affiliated Fin. Corp.,* 600 F.Supp. 987, 994 (N.D.Ill.1984) (same); *Ashland Oil, Inc. v. Gleave,* 540 F.Supp. 81, 84–86 (W.D.N.Y.1982); *see Sedima, S.P.R.L. v. Imrex Co.,* 741 F.2d 482, 489 n. 20 (2d Cir.1984) (concluding, in extended dictum, that § 1964(c) was not intended to provide equitable relief), *rev'd on other grounds,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985); *Dan River, Inc. v. Icahn,* 701 F.2d 278, 290 (4th Cir. 1983) (implying, without deciding, that equitable relief unavailable to private plaintiff under RICO); *Trane Co. v. O'Connor Securities,* 718 F.2d 26, 28–29 (2d Cir.1983) (same); *cf. In re Fredeman Litigation,* 843 F.2d 821, 830 (5th Cir.), *reh'g denied,* 847 F.2d 840 (5th Cir.1988) (RICO does not authorize injunction to restrain defendants' transfer of assets; suggesting approval of *Wollersheim* ); *but see Aetna Cas. & Sur. Co. v. Liebowitz,* 570 F.Supp. 908, 910–11 (E.D.N.Y.1983) (Pratt, J.) (Congress did not intend civil RICO provisions to deprive district court of traditional equitable jurisdiction), *aff'd on other grounds,* 730 F.2d 905 (2d Cir.1984); *Bennett v. Berg,* 685 F.2d 1053, 1064 (8th Cir.1982) (suggesting injunctive relief available either under RICO or general equitable powers), *aff'd on reh'g,* 710 F.2d 1361 (8th Cir.) (en banc), *cert. denied,* 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983).

In *Sedima,* the Second Circuit, after an extensive review of RICO's legislative history, observed that "[i]t thus seems altogether likely that § 1964(c) as it now stands was not intended to provide private parties injunctive relief." 741 F.2d at 489 n. 20. However, the precedential effect of this dictum, if dictum is accorded any precedential quality, is questioned by what *Wollersheim* referred to as "the Supreme Court's total rejection of the conclusions drawn by the Second Circuit from its historical analysis of the RICO statute. *See* [473 U.S. 479], 105 S.Ct. 3275." *Wollersheim,* 796 F.2d at 1081. Nevertheless, *Wollersheim* also concluded that civil RICO does not authorize injunctive relief to private parties.

Reduced to outline form, *Wollersheim* rationalized as follows:

1. Under ordinary rules of statutory construction, the express inclusion of an *injunctive* remedy to the United States in § 1964(b) and a *damage* remedy to private parties in § 1964(c) implies the exclusion of a *private injunctive* remedy. *Wollersheim,* 796 F.2d at 1083. The Second Circuit accepted a variant of this argument in holding that the United States is not a "person" entitled to sue for damages under § 1964(c), in part because it was not expressly so authorized. *United States v. Bonanno Organized Crime Family of La Cosa Nostra,* 879 F.2d 20, 27 (2d Cir.1989); *cf. Shore Realty Corp.,* 759 F.2d at 1049 (express grant of injunctive remedy to United States under environmental statute precludes implied grant of injunctive relief to states, citing RICO § 1964 as example).

2. The House of Representatives, when formulating RICO's private remedy provisions, rejected an express authorization of private injunctive relief, H.R. 19215, 91st Congress, 2d Sess. 116 Cong.Rec. 31,914 (1970), in favor of only an explicit private action for treble damages, H.R. 19586, 91st Cong. 2d Sess. 56 (1970). *Wollersheim,* 796 F.2d at 1084–85; *see also Sedima,* 741

---

tions, or take such other actions, including the acceptance of satisfactory performance bonds, as it shall deem proper.

(c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

(d) A final judgment or decree rendered in favor of the United States in any criminal proceeding brought by the United States under this chapter shall estop the defendant from denying the essential allegations of the criminal offense in any subsequent civil proceeding brought by the United States.

F.2d at 488 n. 18, 489 n. 20, and 473 U.S. at 487–88, 105 S.Ct. at 3280–81 (referring to same legislative history). During the House floor debate on RICO, an amendment providing for a private injunctive remedy was offered by Rep. Steiger, but withdrawn without a vote because the proposal for a "new remedy" had not been considered by the Judiciary Committee. *Wollersheim,* 796 F.2d at 1086, quoting 116 Cong.Rec. at 35,346 (1970) (remarks of Rep. Poff, RICO's House sponsor). *See also Sedima,* 741 F.2d at nn. 20, 22, and 473 U.S. at 487–88, 105 S.Ct. at 3280–81 (noting hostility to proposal for private injunctive remedy). In the next term of Congress, the same amendment as that offered by Rep. Steiger was proposed to amend RICO. S. 16, 92nd Cong., 1st Sess. (1971). The Bill passed the Senate, but not the House and never became law. *Wollersheim,* 796 F.2d at 1086. Thus, Congress, presented with proposals expressly providing a private injunctive remedy in civil RICO, has consistently rejected such a provision.

3. Section 1964(c) is analogous to Section 4 of the Clayton Act, 15 U.S.C. § 15(a), which authorizes a private treble damage remedy in antitrust violations in substantially identical language. Section 4 of the Clayton Act has been held to preclude private injunctive relief. *Paine Lumber Co. v. Neal,* 244 U.S. 459, 471, 37 S.Ct. 718, 719, 61 L.Ed. 1256 (1917). Congress was aware of and, had it desired to do so, "could have completed the analogy between civil RICO and the antitrust laws by including in civil RICO a private equitable relief remedy like section sixteen of the Clayton Act [expressly authorizing private injunctive remedy]. That it did not do so ... strongly suggests that Congress did not intend to give private civil RICO plaintiffs access to equitable remedies." *Wollersheim,* 796 F.2d at 1087. *Compare United States v. Cooper Corp.,* 312 U.S. 600, 61 S.Ct. 742, 85 L.Ed. 1071 (1941) (United States not authorized to bring action for treble damages under Section 7 of Sherman Act), *and Bonanno Organized Crime Family,* 879 F.2d at 23–24 (relying on *Cooper* to reach similar conclusion under § 1964(c)).

■ The arguments marshaled in *Wollersheim* and the Second Circuit opinion in *Sedima* are convincing, indeed compelling. The private remedy provision of RICO, now § 1964(c), was a late addition to the statute as it progressed through Congress. The legislative history discusses the provision, to the extent it is discussed at all, as a private *damages* remedy. *See, e.g.,* 116 Cong.Reg. 35,295 (remarks of Rep. Poff); H.R. No. 91–1549, 91st Congress, 2d Sess. 35, *reprinted* 1970 U.S.Code Cong. & Ad. News 4007, 4010. There is nothing in the language or history of § 1964(c) to suggest that in enacting a private damage remedy Congress also authorized private injunctive relief. Accordingly, the court declines to issue an injunction based upon plaintiff's civil RICO claim.

## IV. Pendent State Claims

### A. Injunction Standard

To obtain an injunction plaintiff must demonstrate "not only that it is likely to suffer irreparable injury if relief is denied but also that there is either (1) a likelihood of success on the merits or (2) a sufficiently serious question going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in the plaintiff's favor." *Proctor & Gamble Co. v. Chesebrough–Pond's, Inc.,* 747 F.2d 114, 118 (2d Cir.1984); *Coca–Cola v. Tropicana Prod., Inc.,* 690 F.2d 312, 314–15 (2d Cir.1982). The pendent claims allege conspiracy (Count II); violation of Conn.Gen.Stat. § 46a–58(a) (Count IV); negligence (Count VI); and public nuisance (Count VI).

#### (1) Irreparable Injury

■ Plaintiff claims that the occupations of the Center on April 1 and June 17, and the rescuers' conduct after arrest, interfered with its ability to provide police, fire and ambulance services to its citizens. It alleges that a renewed occupation would cause similar injuries for which there is no adequate remedy at law. It is found that the April and June occupations of the Center caused injury to the Town for which there is no adequate remedy at law and

which would represent irreparable injury to their likely recurrence.

1. Both the April 1 and June 17 occupations required the Town to transfer numerous on-duty police officers from other scheduled duties to the task of arresting and processing protesters. Approximately forty officers, about one-third of the department, were stationed at the Center on each date. Correspondingly, the police department was not able to maintain the level of police visibility, presence and protection normally provided the Town. Had an emergency situation developed away from the Center, the department would not have been able to shift officers to that situation promptly. In addition, police officers were required to remain on duty for periods exceeding their normal duty shift. The extended working hours resulted, upon officers' resumption of normal duties, in fatigue, reduced alertness, and less effectiveness. Wholly apart from the overtime wage expense, these injuries present harm which cannot be quantified nor redressed by compensatory damages.

2. The April 1 protest required the Town to detail a fire department unit to free interlocked rescuers. That effort, the personnel and equipment committed, reduced the ability of the fire department to provide emergency services to others.

3. On both dates, an ambulance and attendants were required to stand by at the Center and later at the courthouse where arrestees were processed. This diversion increased the response time for emergency ambulance calls within the Town, at considerable risk to other citizens in need. By contract, the response time is required to be within five minutes for 80% of the calls. During the period June 17–19, while an ambulance and crew were detailed to the Center, response time exceeded five minutes in approximately 50% of the ambulance calls.

As to a recurrence of an occupation of the Center should an injunction not issue, the following is also found:

4. There was little or no warning of the April 1 and June 17 protests.

5. On June 17, defendant Calvin threatened additional, even larger protests in the future.

6. In the week before July 22, 1989, the Center received numerous telephone calls from persons, mainly men, requesting directions to the Center and/or appointments for Saturday, July 22.

7. These calls formed a pattern similar to the pattern of calls which occurred prior to the June 17 occupation.

8. The TRO entered by this court was in effect from June 30 to July 10 and from July 13 to June 23.

9. No occupation of the Center occurred on July 22. However, a large-scale protest, at which persons were arrested for trespassing, did occur on that date at an abortion clinic in Brookline, Massachusetts, where no TRO was in effect.

The court concludes that there is a reasonable probability that but for the TRO a trespassory occupation of the Center would have occurred on July 22, and a protest will occur at the Center during the pendency of this action.

### (2) *Likelihood of Success on the Merits*
### *(a) Conspiracy*

The conspiracy count claims that defendants have engaged in unlawful activities "to obtain a power of coercion," Complaint, ¶ 89, and that plaintiff has sustained damages thereby. *Id.*, ¶ 90. Connecticut does not recognize an independent action for civil conspiracy. *See Acmat Corp. v. W.E. O'Neil Const. Co.*, 12 Conn.L.Trib. 18 (2 Conn.Sup.Rep. 121, Jan. 31, 1986). Liability must be based on "damages caused by acts committed pursuant to a formed conspiracy rather than by the conspiracy itself." *Cole v. Associated Const. Co.*, 141 Conn. 49, 54, 103 A.2d 529 (1954); *Acmat Corp.*, 12 Conn.L.Trib. at 32 (liability also attaches where defendant aided and abetted tortious conduct). Plaintiff relies on the theory that defendants have intentionally interfered with the Town's financial expectancies. Post–Hearing Memorandum at 47. However, the tort of interference with financial expectancies requires a showing "that, except for the tortious in-

terference of the defendant, there was a reasonable probability that plaintiff would have entered into a contract or made a profit." *Goldman v. Feinberg*, 130 Conn. 671, 675, 37 A.2d 355 (1944). The Town makes no such claim in the complaint and has offered no evidence thereof. At most, defendants caused the Town to incur expenses in discharging its legal obligations. The Town is not a profit generating entity. Although the Town argues that it is a "business," it has not explained the nature of the business interest with which defendants interfered, nor specified any financial interest it would have obtained or enjoyed from a third party but for their conduct. Indeed, plaintiff has not shown that Connecticut law recognizes the operation of a municipal department, let alone a governmental function such as a police department, as a business for the purposes of this tort. Absent some evidence of plaintiff's financial expectancy, its probability of success on this claim is minimal.[5]

### (b) Conn.Gen.Stat. § 46a–58(a)

█ Section 46a–58(a) provides:
It shall be a discriminatory practice in violation of this section for any person to subject, or cause to be subjected, any other person to the deprivation of any rights, privileges or immunities, secured or protected by the constitution or laws of this state or of the United States, on account of religion, national origin, alienage, color, race, sex, blindness or physical disability.

A person aggrieved by a discriminatory practice under this section may complain to the Connecticut Commission on Human Rights and Opportunities, which is empowered to determine damages and order injunctive relief. Conn.Gen.Stat. Annot. §§ 46a–82, 82(a)–(d) (West Supp.1989); *see Sullivan v. Board of Police Comm'rs*, 196 Conn. 208, 216–17, 491 A.2d 1096 (1985). Enforcement or judicial review of such an order and temporary or permanent equitable relief may be had by appeal to the Superior Court. Conn.Gen.Stat. Annot. §§ 46a–94a, 95(a) (Supp.1989). However, the statute does not provide a private right of action for violations of § 46a–58. *See Atkins v. Bridgeport Hydraulic Co.*, 5 Conn.App. 643, 647–48, 501 A.2d 1223 (1985) (no private right of action for violation of § 46a–60); *Osborn v. Rocklen Automotive Parts & Serv., Inc.*, 4 Conn.App. 423, 425, 494 A.2d 622 (1985); *compare* §§ 46a–98, 98a, 99 (creating private actions for other discriminatory conduct, but not for violations of § 46a–58). The administrative procedure, with appellate review, is the sole remedy for such a violation. It is not clear whether plaintiff, not the direct victim of the alleged violation, has standing to bring a complaint as a "person claiming to be aggrieved" under Conn.Gen.Stat. § 46a–82. However, the Connecticut cases have held that failure to follow the administrative procedures deprives the courts of jurisdiction over a claim of violation of § 46a–60. *Sullivan*, 196 Conn. at 217–18, 491 A.2d 1096. That rule must also be applied to § 46a–58. Therefore, regardless of plaintiff's standing, its claim for injunctive relief under that provision cannot succeed as a matter of law. There is neither a likelihood of success nor fair ground for litigation on Count IV.

### (c) Public Nuisance

Plaintiff alleges that defendants' activities constitute a public nuisance in that they are "designed to and do interfere with and endanger the public security, safety, and health and welfare of the Town of West Hartford and its citizens, especially those women who seek abortions, family planning or medical services at West Hartford facilities where abortions are performed." Verified Complaint, ¶ 103.

█ " 'Nuisance is a word often very loosely used; it has been not inaptly described as "a catchall of ill-defined rights." In its proper use, however, it involves as an essential element that it can be the natural tendency of the act or thing complained of

---

5. Indeed, because plaintiff has not articulated the nature of its purported financial expectancy in either the complaint or its memoranda, this claim does not even supply a fair ground of litigation on the merits.

to create danger and inflict injury upon person or property.' *Hoffman v. City of Bristol*, 113 Conn. 386, 389, 155 A. 499 (1931)." *Gonchar v. Kelson*, 114 Conn. 262, 271, 158 A. 545 (1932). " 'Nuisances are public when they violate public rights, and produce a common injury; and where they constitute an obstruction to public rights, "that is, the rights enjoyed by citizens as part of the public." 39 Am.Jur. 286. "... [I]f the annoyance is one that is common to the public generally, then it is a public nuisance.... The test is not the number of persons annoyed, but the possibility of annoyance to the public by the invasion of its rights. A public nuisance is one that injures the citizens generally who may be so circumstanced as to come within its influence.' *Nolan v. New Britain*, 69 Conn. 668, 678, 38 A. 703 (1897)." *Higgins v. Connecticut Light & Power*, 129 Conn. 606, 611, 30 A.2d 388 (1943). *See generally* Restatement (2d) Torts, § 821B (defining public nuisance as "an unreasonable interference with a right common to the general public"). As a government entity, a municipal corporation is entitled to bring an action to enjoin a public nuisance which threatens its citizens. *See, e.g., Planning & Zoning Comm'n of Middlefield v. Zemel Bros.*, 29 Conn.Supp. 45, 270 A.2d 562 (1970) (enjoining music festival in action by town authorities); Restatement (2d) Torts, § 821C(2)(b) (public official may bring suit on behalf of political subdivision); *New York State Organization for Women v. Terry*, 704 F.Supp. 1247, 1261 (S.D.N.Y. 1989) (enjoining public nuisance on city's claim under New York law).

Plaintiff has established a probability of success on its public nuisance claim. The evidence showed that the occupations of the Center on April 1 and June 17 interfered with provision of medical services by the Center and a dentist whose office was next door. On April 1, patients were blocked from entering the Center or required to run a gauntlet to enter; some were late for their appointments. On June 17, about twenty-five to thirty-five patients did not show for their scheduled appointments and all patients were late. Although patients were scheduled for treatment, including gynecological exams, dispensing of medication, and abortions, as a result of the occupation no patients could be treated that day. Besides the interference with these medical services, the occupations and subsequent large-scale arrests also diverted substantial police, fire and ambulance services away from their normal allocation in protecting the public. Approximately forty officers, an ambulance and paramedic were assigned to the Center for the duration of each protest and subsequent arrest procedures. On April 1, a fire department unit equipped with the Hurst "jaws of life" tool was also required at the scene, potentially impeding its availability for other emergencies.

The right to medical services, including abortion, and the right to emergency police, fire and ambulance services are rights common to all members of the general public. *See, e.g., Terry*, 704 F.Supp. at 1261–62 (right to medical care). Defendants' conduct has interfered with these rights with an obvious potential to deprive and delay the public access to medical care and the protection of the Town's police and fire departments.

Plaintiff has also established that the danger created was a continuing one and that defendants' use of the premises was unreasonable. *State v, Tippetts–Abbett–McCarthy–Stratton*, 204 Conn. 177, 183, 527 A.2d 688 (1987) (continuity and unreasonable use of land are necessary elements of nuisance); *Kostyal v. Cass*, 163 Conn. 92, 99–100, 302 A.2d 121 (1972). The risk to the public was not the result of a single act or isolated, sporadic incident, but of repeated, organized, conjunctive, sustained and willful conduct. Thus, although temporary in duration, the conduct had a continuing effect and was not sudden or unexpected. *See Warren v. City of Bridgeport*, 129 Conn. 355, 358, 28 A.2d 1 (1942) (operation of street sweeper in wrong direction of highway at night was sufficiently continuing danger); *cf. Demare v. Guerin*, 125 Conn. 362, 365, 5 A.2d 711 (1939) (automobile's sudden brake failure not a nuisance); *Kostyal*, 163 Conn. at 101, 302 A.2d 121 (distinguishing continuing danger

from single act). Its repetition is threatened.

■ In entering the Center and refusing to leave when ordered to do so, the protesters' use of the property was not merely unreasonable, but unlawful, i.e., criminal trespass. Conn.Gen.Stat. § 53a–107; Restatement (2d) Torts, § 821B(2)(2) (violation of statute may sustain holding of unreasonableness). The Connecticut cases have applied a "functional test" to determine whether a defendant "uses" property in a manner sufficient to subject him to liability for a nuisance. *Tippetts*, 204 Conn. at 184, 527 A.2d 688. Ownership or tenancy of the property is not a prerequisite to liability. *Id. Tippetts* considered a claim that defendant created a public nuisance by negligently designing and supervising the construction of a highway bridge which collapsed more than two decades later. Determining reasonable use in that context, the court stated: "[A] critical factor ... is whether the defendant exercises control over the property that is the source of the nuisance." *Id.* The question of whether a particular defendant's control is sufficient to subject him to nuisance liability "normally is a jury question." *Id.* at 185, 527 A.2d 688.

In the case at bar, defendants' conduct, rather than any condition created on the property, is the source of danger to the public. Assuming the rule stated by *Tippetts* applies, plaintiff has made a sufficient showing of de facto exercise of control by defendants of the premises. On both the dates in question, the rescuers prevented use of the premises for their intended purposes—the provision of medical services. On both occasions, a dental office was forced to close; on June 17, the Center was forced to cease its operations. Conversely, defendants used the premises for their own purposes—to dramatize their opposition to abortions and discourage the performance of same. That defendants were eventually ousted does not alter the fact that, for the duration of the protests, defendants appropriated the private premises for a use directly opposed to the owner's intention and wish.

Plaintiff has thus shown a probability of success on the merits of its public nuisance claim. The tendency of defendants' conduct to injure the public is found to lie in the interference with access to medical services and the diversion of police and emergency services necessary to respond to large-scale criminal trespass. Therefore, this finding is limited to those defendants shown by the evidence to have either (1) personally entered and remained on the Center's premises or physically blocked entrance or egress to or from the Center's premises after having received a request from any police officer or employee of the Center or its landlord to leave; or (2) directed or aided and abetted any person to perform the acts listed above. In accordance with the findings of fact made above, an injunction shall issue as to the following defendants:

Operation Rescue
John Kladde
John Charles Grant
Jean Pollock
Catherine A. Jersey
Lillian A. Loughlin
William Calvin
William P. Cotter
Hjalmar Syversen

#### (d) Negligence

In view of the determination to grant an injunction against the public nuisance, based on defendants' intentional conduct, it is unnecessary to address the negligence claim in detail. As to those defendants against whom an injunction is issued, a negligence theory would add no relief not already included under public nuisance. As to the other defendants, plaintiff has not introduced sufficient evidence of negligence to permit an injunction.

### V. *Appropriate Injunctive Relief*

#### A. *First Amendment Considerations*

■ In opposing an injunction and arguing the scope of relief, defendants rely heavily upon the assertion that an injunction would chill the free exercise of their first amendment rights. The short answer

to this argument is that defendants have no first amendment right to carry on even pure speech activities on private property and against the wishes of the Center and its landlord. *Hudgens v. NLRB,* 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976); *Cologne v. Westfarms Associates,* 192 Conn. 48, 66, 469 A.2d 1201 (1984); *cf. Frisby v. Schultz,* 487 U.S. 474, 108 S.Ct. 2495, 2499, 101 L.Ed.2d 420 (1988) (no right to force speech into the home of unwilling listener). The same principle certainly applies to conduct such as remaining on the premises after being instructed to leave or the blocking of exists and entrances. At the hearing on injunctive relief, the landlord's property manager made clear his objection to the latter activities on the subject premises. This objection and the Center's intervention in this action in support of an injunction take that conduct out of the protection of the first amendment altogether.

 Attempts to persuade others are within the core of the first amendment's protection. *Thomas v. Collins,* 323 U.S. 516, 537, 65 S.Ct. 315, 325, 89 L.Ed. 430, *re'g denied,* 323 U.S. 819, 65 S.Ct. 557, 89 L.Ed. 650 (1945). Expressive conduct such as picketing, leafleting, and demonstrating enjoys the same freedom. *See Frisby,* 108 S.Ct. at 2499. As defendants point out, even expression intended to be "coercive" or "offensive" is protected provided the speaker refrains from violence and the threat of violence. *See NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 911, 916, 102 S.Ct. 3409, 3424, 3427, 73 L.Ed.2d 1215, *reh'g denied,* 459 U.S. 898, 103 S.Ct. 199, 74 L.Ed.2d 160 (1982); *Texas v. Johnson,* —— U.S. ——, 109 S.Ct. 2533, 2541–42, 105 L.Ed.2d 342 (1989) (offensive speech). Yet, a bright line is crossed at the threshold of private property. Forcible, unauthorized entry on the Center's property, willful trespass, is not protected conduct no matter what its purpose. *See Northeast Women's Center, Inc. v. McMonagle,* 670 F.Supp. 1300, 1308 (E.D.Pa. 1987), *aff'd in part, remanded in part,* 868 F.2d 1342 (3d Cir.1989); *Portland Feminist Women's Health Center v. Advocates for Life,* 859 F.2d 681, 686 (9th Cir. 1988) (approving injunction against trespass and obstruction of access to abortion clinic); *see Claiborne,* 458 U.S. at 920, 102 S.Ct. at 3429. Moreover, the clarity of this principle is such that an injunction framed upon it carries no chilling effect against protected first amendment expression. Accordingly, an injunction shall issue in restraint of the listed defendants during the pendency of this action.

### NOTICE

It is noted that of the defendants against whom injunctive relief is to be granted, the following defendant has not been served:

John Charles Grant

As to that defendant, plaintiff shall complete service within twenty (20) days hereof and file a return thereof. Service shall include a copy of this order as well as the complaint. Defendant shall, within twenty (20) days of service, show cause by filing, in writing, any reasons why this order should not, for the reasons set forth herein, be binding on him. Absent such filing, this order shall, after twenty (20) days subsequent to service in accordance herewith, be of full force and effect and binding upon such defendant.

### B. *Preliminary Injunction*

IT IS HEREBY ORDERED that defendants:

Operation Rescue
John Kladde
John Charles Grant
Jean Pollock
Catherine A. Jersey
Lillian A. Loughlin
William Calvin
William P. Cotter
Hjalmar Syversen

shall not hereafter, during the pendency of this action, unless excused or altered by further order of this court: enter or remain upon the property or offices of the Summit Women's Center in the Town of West Hartford, Connecticut; physically block, obstruct, or otherwise impede access (either ingress or egress) to the property or offices

of the Summit Women's Center in the Town of West Hartford, Connecticut, either by themselves, individually, or in conjunction with others; direct, aid, abet, counsel, procure, arrange, encourage, or assist any person to perform the actions above listed.

This order shall be binding only upon defendants Operation Rescue, John Kladde, John Charles Grant, Jean Pollock, Catherine A. Jersey, Lillian A. Loughlin, William Calvin, William P. Cotter, and Hjalmar Syversen, and upon their officers, agents, servants, employees and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

Violators of this order may be adjudged in contempt of court.

SO ORDERED.