**TOWN OF WEST HARTFORD, a municipal corporation located in the State of Connecticut, Plaintiff–Appellee,**

v.

**OPERATION RESCUE, Joseph M. Scheidler, Randall A. Terry, Project Life, Inc., Connecticut Pro–Life Action Network, John Kladde, John Charles Grant, Eileen M. Haggerty, Jean Pollock, Spear Printing Company, John M. Spear, Catherine A. Jersey, Maria D. Garvey, Lillian A. Loughlin, William A. Calvin, William P. Cotter, Hjalmar Syversen, Faithful and True Roman Catholics, John Doe(s) and Jane Doe(s), Defendants.**

9. *See supra* note 7.

**Appeal of OPERATION RESCUE, Randall A. Terry, Project Life, Inc., Lillian A. Loughlin, John Charles Grant, Eileen M. Haggerty, Jean Pollock, Spear Printing Company, John M. Spear, Catherine A. Jersey and Hjalmar Syversen, Defendants–Appellants.**

**Nos. 979 to 981, Dockets 89–9051, 89–9053 and 89–9055.**

United States Court of Appeals, Second Circuit.

Argued March 12, 1990.

Decided Oct. 10, 1990.

As Amended on Denial of Rehearing Dec. 26, 1990.

Joseph P. Secola (George J. Mercer, The Rutherford Institute of Connecticut, Milford, Conn., of counsel), for defendants-appellants Randall A. Terry, Operation Rescue and Project Life, Inc.

Vincent P. McCarthy, New Milford, Conn., for defendants-appellants Lillian A. Loughlin, John Charles Grant, Eileen M. Haggerty, Jean Pollock, Spear Printing Co., John M. Spear, Catherine A. Jersey, and Hjalmar Syversen.

Patrick G. Alair, Asst. Corp. Counsel, Town of West Hartford, West Hartford, Conn., for plaintiff-appellee Town of West Hartford.

Nancy J. Gannon, George W. Koch, Jr., Milwaukee, Wis., for amicus curiae Catholic League for Religious and Civil Rights.

Before KEARSE, CARDAMONE and MAHONEY, Circuit Judges.

MAHONEY, Circuit Judge:

This appeal is taken from a preliminary injunction barring defendants-appellants [1] from entering or remaining upon the property or offices of the Summit Women's Center (the "Center") in the Town of West Hartford, Connecticut, or impeding access thereto. The district court found that such activities had occurred on April 1 and June 17, 1989 for the purpose of impeding the performance of abortions at the Center.

The preliminary injunction was premised upon a pendent state law claim of public nuisance. The only basis for federal jurisdiction was a claim that defendants violated Title 18, part 1, chapter 96 of the United States Code, entitled "Racketeer Influenced and Corrupt Organizations" ("RICO"), specifically 18 U.S.C. § 1962 (1988), through predicate acts of extortion violative of the Hobbs Act, 18 U.S.C. § 1951 (1988).

Concluding that plaintiff-appellee the Town of West Hartford (the "Town") has not asserted a colorable basis for federal jurisdiction, we vacate the preliminary injunction and remand with instructions to dismiss the complaint.

### Background

A. Findings of the District Court.

We draw our factual summary from the district court's findings of fact, set forth in *Town of West Hartford v. Operation Rescue,* 726 F.Supp. 371, 373–75 (D.Conn.1989).

This case arises from demonstrations conducted at the Center, which is a health

---

1. Defendants John Kladde, William A. Calvin, and William P. Cotter, although enjoined, have not appealed. Defendants-appellants Randall A. Terry, Project Life, Inc., Eileen M. Haggerty, Spear Printing Company, and John M. Spear have appealed, although not enjoined. Their authority to do so is dubious. *See Sage v. Central R.R.,* 99 U.S. 334, 346, 25 L.Ed. 394 (1878). In view of the disposition of this appeal, however, the issue is academic.

care facility that provides medical services, including abortions, to women. The Center shares occupancy of a building within a shopping center at 345 North Main Street, West Hartford, Connecticut with several other businesses, including medical and dental offices.

On April 1 and June 17, 1989, large groups of demonstrators gathered outside the Center to protest its abortion practices. The demonstrators picketed, distributed leaflets, and attempted to persuade women not to enter the Center or to have abortions. Among the demonstrators were certain individuals—termed "rescuers" by the district court—who, as part of the protests, entered and/or blocked the offices of the Center in order to close down the Center and prevent the performance of abortions. During each protest, rescuers occupied the Center for the entire business day, despite demands that they leave by Center employees, an employee of the landlord, and the West Hartford police. Elevators were disabled, and access impeded both within and to the Center, as well as to other facilities within the building. During the April 1 protest, patients entering the Center and its treatment rooms encountered a "gauntlet" of rescuers who urged the patients not to have abortions. The June 17 protest prevented the treatment of any patients at the Center that day. A receptionist at the Center had an anxiety attack on June 17, and four Center employees quit their jobs, citing their fear of the protests.

Approximately forty police officers from the Town responded to the scene on both occasions, together with an ambulance and paramedic team under contract with the Town. The ambulance and paramedics were also on hand when arrestees from the demonstrations were processed at a local court. Members of the Town fire department were summoned on April 1 to separate five rescuers who had used locks to fasten themselves together.

Large numbers of people were arrested at both protests: sixty-one on April 1, and two hundred sixty-one on June 17. They were charged with criminal trespass, inter-fering with a police officer, and refusal to be processed. The latter charges were premised upon the demonstrators' passive resistance (i.e., their refusal to walk or display identification after being arrested).

In the words of the district court, "[t]he demonstration and rescue was organized, prepared, and orchestrated." 726 F.Supp. at 374. On both occasions, persons described as "negotiators" gave instructions to the arrested persons and told officials that they were authorized to speak for the arrestees. The negotiator on April 1 was a man known only as "Bill." The negotiator on June 17 was defendant William A. Calvin.

The district court further stated that "[t]here appears to be a substantial association of people who are committed to eliminating the availability of abortions. The association appears to be loose and not formed." 726 F.Supp. at 375. Groups have associated under the names "Connecticut Pro–Life Action Network," "Faithful and True Roman Catholics," and "Operation Rescue." Id. Defendant-appellant Randall A. Terry "proclaims a role" in the latter organization, which, like the other groups named, was not shown to have a legal status.

Defendants John Kladde, John Charles Grant, Catherine A. Jersey, William A. Calvin, William P. Cotter, Hjalmar Syversen, Lillian A. Loughlin and Jean Pollock were "all shown to have been personally involved as rescuers." Id. "An individual named Haggerty was involved, but not clearly identified as Eileen Haggerty, the named defendant." Id.

## B. The Complaint and RICO Case Order.

On June 29, 1989, the Town commenced the present action against the named defendants. In addition to asserting a RICO claim pursuant to 18 U.S.C. § 1962 (1988) based upon predicate acts of extortion in contravention of 18 U.S.C. § 1951 (1988), the complaint alleged a conspiracy to deprive civil rights in violation of 42 U.S.C. § 1985(3) (1982), and various pendent state

claims, including public nuisance. The jurisdictional statement of the Town's complaint read as follows:

This Court has subject matter jurisdiction under 28 U.S.C. Section 1331, 28 U.S.C. Sections 1343 and 2201, 18 U.S.C. Section 1964, 15 U.S.C. Sections 21 and 26, 42 U.S.C. Section 194, and the principles of pendent jurisdiction.

28 U.S.C. § 1331 (1988) confers original jurisdiction upon federal district courts as to "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1343 (1988) confers such jurisdiction as to certain civil actions regarding civil rights and the elective franchise. 28 U.S.C. § 2201 (1988) authorizes any federal court to render declaratory judgments in any "case of actual controversy within its jurisdiction." 18 U.S.C. § 1964 (1988) vests jurisdiction in the district courts to grant civil remedies for violations of 18 U.S.C. § 1962 (1988). 15 U.S.C. §§ 21 and 26 (1988) deal with enforcement of the federal antitrust laws. 42 U.S.C. § 194 (1982) requires the Secretary of Health and Human Services to furnish sufficient quarters for the work of the Children's Bureau, a component of the Department of Health and Human Services, at an annual rental not to exceed $2,000.

In its opinion, the district court stated that the Town's "announced intention to withdraw its § 1985 claim ... leaves the RICO claim as the sole basis for federal jurisdiction over this action." 726 F.Supp. at 376. The announcement occurred in a document filed by the Town on August 25, 1989, in response to a series of inquiries in a RICO Case Order entered by the district court. The Town's brief on appeal confirms that "[b]y amended complaint dated December 6, 1989, the Town abandoned its state and federal civil rights claims."

In addition, we note that a motion by the Center to intervene in this case was granted August 28, 1989, after the preliminary injunction hearing, but the decision from which this appeal is taken addressed preliminary relief "only as a question of entitlement of the [Town]." 726 F.Supp. at 373 n. 1. The Town's amended complaint did drop its claim under 42 U.S.C. § 1985 (1988), but made no substantial change to its RICO claim. In addition, the Center was added as a plaintiff suing under RICO on its own behalf and on behalf of a class of similarly situated abortion facilities na-

tionwide. Like the Town's claim, the Center's RICO claim was grounded on predicate Hobbs Act violations, but the Center's theory of extortion significantly differed from that of the Town. We do not address whether the Center has adequately invoked federal jurisdiction, because it is fundamental that an intervening claim cannot confer subject matter jurisdiction over the action it seeks to join. *See Pressroom Unions–Printers league Income Sec. Fund v. Continental Assurance Co.*, 700 F.2d 889, 893 (2d Cir.) ("The longstanding and clear rule is that 'if jurisdiction is lacking at the commencement of [a] suit, it cannot be aided by the intervention of a plaintiff with a sufficient claim.'") (quoting *Pianta v. H.M. Reich Co.*, 77 F.2d 888, 890 (2d Cir.1935)), *cert. dismissed*, 463 U.S. 1233, 104 S.Ct. 26, 77 L.Ed.2d 1449, *cert. denied*, 464 U.S. 845, 104 S.Ct. 148, 78 L.Ed.2d 138 (1983); *see also* 7C C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1917, at 457 (2d ed. 1986) ("Intervention cannot cure any jurisdictional defect that would have barred the federal court from hearing the original action.").

The upshot of all the foregoing is that we address the question of subject matter jurisdiction in terms exclusively of the Town's RICO claim. That claim, set forth as the first count of the Town's complaint, incorporates by reference the preceding jurisdictional and factual allegations, and then states in full:

82. The defendants have participated in and have conducted a series of activities, as alleged, that include predicate offenses in violation of 18 U.S.C. Section 1951 (the Hobbs Act) that constitute a pattern of "racketeering" activities under 18 U.S.C. Section 1961(1), in that their acts and conduct involve threats, extortion, interference with business and property interests, obstructions of justice, obstruction of local law enforcement and acts that are indictable under 18 U.S.C. Section 1951 (the Hobbs Act), and 18 U.S.C. Section 1961.

83. The defendants have conspired to commit and engaged in a pattern of extortionate acts, as defined under the Hobbs Act, in West Hartford and elsewhere, and those acts have caused injury to the governmental functions and property of the plaintiff, including, without limiting the foregoing, the creation of a severe restriction of [sic] upon the ability of the West Hartford Police Department

to provide police protection for its citizens, the deprivation of medical services from clients of the Summit Women's Center, the deprivation of individuals' freedom to operate and/or patronize other businesses on the premises, extraordinary overtime costs and injury to one police officer employed by plaintiff, for which injury the plaintiff has been forced to expend sums as injury pay, medical costs and expenses and other benefits for which the plaintiff is responsible under Connecticut General Statutes § 31–293 and under which statute the plaintiff is given a statutory right of recovery.

84. The actions of the defendants, aforesaid, imperiled public safety, peace and order.

85. The defendants, aforesaid, both as enterprises under 18 U.S.C. Section 1961(4) and as individuals, engaged in a pattern of racketeering activity, have crossed state lines through travel to organize, train, conspire and take action in furtherance of an illegal conspiracy, through the use of interstate telephone lines and U.S. mail services, through the interference with interstate commerce, and such actions were intended and designed to cause fear and threat of violence, to imperil public safety, peace and good order in West Hartford through the use and threat of fear and threat of violence, against both citizens and residents of West Hartford and citizens and residents of other states and communities in the United States of America visiting West Hartford.

86. The actions of the defendants, aforesaid, have resulted in direct economic injury, both tangible and intangible, to the plaintiff.

The complaint earlier details the alleged activities deemed to constitute the predicate acts underlying the RICO claim. The allegations portray an expansive, well organized network spurring abortion protests in various parts of the United States, and recount specific instances of organized protest. The complaint also describes the alleged activities at the Center on the dates in question, and identifies those actions of the defendants that the Town characterizes as "extortionate." As to the events of April 1, it states:

59. [At the Center] the defendants, or some of them, acting in concert with others, deliberately and maliciously employed techniques designed to slow the West Hartford Police Department in its efforts to remove them from [the Center and the surrounding property], including resisting arrest by passive and active methods such as going limp or struggling to avoid being handcuffed, locking themselves together with Kryptonite bicycle/motorcycle locks and refusing to walk from the Summit Women's Center to waiting police vehicles or to identify themselves.

60. At [the Center and the surrounding property] the defendants, or some of them, acting in concert with others through the defendant John Kladde, who was identified by the protesters' negotiator as their leader, deliberately and maliciously sought to extort concessions from the West Hartford Police Department regarding the type and number of charges to be filed against those arrested, as well as the punishment to be sought in connection with those charges in exchange for cooperation in providing keys for the Kryptonite locks by which five protesters were bound together within the premises of [the] Center. . . .

61. [At the Center] the defendants, including John Charles Grant, acting in concert with others, deliberately and maliciously determined further to harass and extort [the Town] by refusing to identify themselves such that they could not be released pending arraignment unless charges against them were reduced or dropped, with the result that extraordinary manpower was needed to control arrestees in a courtroom from Saturday, April 1, through Monday morning, April 3, 1989.

It is further alleged that (1) several defendants "deliberately and maliciously sought to extort a less diligent response to future protests by falsely indicating to newspaper reporters that the West Hartford Police Department had beaten protesters with clubs"; (2) several defendants, "acting in concert with others, deliberately and maliciously commenced and encouraged a campaign of telephone and mail harassment" against the Town "in deliberate efforts to extort a less diligent police response to future protests at the [Center] and elsewhere in the [Town]"; (3) "defendant Spear Printing Co., Inc., through its editor, the defendant John M. Spear, deliberately and maliciously published an incorrect, defamatory account of the April 1, 1989 protest . . . in furtherance of the efforts of the defendants and others to harass, intimidate and extort a less diligent or softened response from the West Hartford

Police to future protest activities" at the Center and elsewhere within the Town; (4) the activities described forced the Town to "divert a large number of its on-duty police officers to [the Center] and subsequently to monitor arrestees and assist in their arraignment, resulting in reduced police protection for the residents of the Town, and incurred expenses in excess of $11,000 in personnel and other costs"; and (5) defendant Jean Pollock, speaking for defendant Connecticut Pro–Life Action Network, held a press conference outside the headquarters of the West Hartford Police Department in which she "deliberately and maliciously sought to intimidate the West Hartford Police Department into softening its response to future protests by publicizing a false and distorted view of the police response to [the April 1 protest]."

The complaint also details the events surrounding the protest that took place June 17, 1989, at which defendants allegedly attempted to "prevent [the Center] from performing abortions on that day and in the future by extortionate means." It states that several defendants, "acting in concert with others[,] deliberately and maliciously employed, and/or directed others to employ, techniques designed to slow the West Hartford Police Department in its efforts to remove them from the property ..., including resisting arrest by passive and active means such as going limp or struggling to prevent being handcuffed." It also states that defendant William Calvin "deliberately threatened the Town" by "indicating that there could be even larger protests in the future unless the police approach changed." It is further alleged that:

> defendants, or some of them, acting in concert with others, deliberately and maliciously determined further to harass and extort the West Hartford Police Department by refusing to identify themselves unless charges against them were reduced or dropped such that police were forced to house them in two courtrooms from Saturday, June 17, 1989, through Monday, June 19, 1989, and to expend extraordinary efforts to handle them, estimated to have cost the Town between $20,000 and $30,000.

The Complaint goes on to describe another "telephone and mail campaign of harassment and intimidation" to "complain about police conduct during the June 17, 1989 protest based upon inaccurate information regarding the incident in a deliberate and malicious effort to obtain a softened response to future protests in furtherance of their cause." Finally, after alleging that the arraignment of the uncooperative June 17 arrestees "took almost twelve hours to accomplish and required the assistance of large numbers of police and State of Connecticut Department of Corrections personnel," the Complaint states:

> On or about Saturday, June 24, 1989, the defendant Faithful and True Roman Catholics published a paid advertisement in *The Hartford Courant* which deliberately, maliciously and falsely stated that "[o]ne priest was badly beaten" and that police officers were violent at the protest of June 17, 1989, and which advertisement exhorted readers to demand investigations into the conduct of West Hartford police by the Governor, State's Attorney and state legislators in an effort to perpetuate the extortionate efforts of the defendants to elicit a reduced response from police to future criminal acts of the defendants and others acting with them.

On July 5, 1989, the district court issued a "RICO Case Order" consisting of a series of inquiries to which the Town was required to respond "in detail and with specificity." The Town submitted its response on August 25, 1989. The order and response included the following exchanges:

> 5. Describe in detail the pattern of racketeering activity or collection of unlawful debts alleged for each RICO claim. A description of the pattern of racketeering shall include the following information:
>
> a. List the alleged predicate acts and the specific statutes which were allegedly violated....
> [*Response:*] The predicate acts upon which the plaintiff's RICO claim are based consist primarily of incidents of extortion in violation of 18 U.S.C. Section 1951(a), commonly known as the Hobbs Act.
>
> b. Provide the dates of the predicate acts, the participants in the predicate

acts, and a description of the facts surrounding the predicate acts....

[*Response:*] The acts of the defendants have occurred on numerous dates commencing prior to 1986 and continuing through the present. Several dates upon which the actions of the defendants and/or some of them have occurred in West Hartford are April 1 through April 3, 1989, April 4, 1989, April 17, 1989, June 17 through 19, 1989 and June 24, 1989. These dates correlate to the dates of the April 1, 1989 and June 17, 1989 "rescues" at the Summit Women's Center, the continuing incarceration of the protesters arrested at those protests by the West Hartford Police Department and the subsequent press statements/news conferences held by the protesters regarding their past and threatened future actions.

f. Describe how the predicate acts form a "pattern of racketeering activity"....

[*Response:*] The definition of "racketeering activity" contained in 18 U.S.C. Section 1961(1) specifically includes violations of 18 U.S.C. Section 1951 (the Hobbs Act). Operation Rescue, as well as the other named defendants acting in conjunction with others, have repeatedly extorted or attempted to extort from providers of abortion services a closure of their facilities. In addition, the defendants have attempted to extort, on repeated occasions, softened police response to their criminal actions in furtherance of their goal of closing abortion facilities. These extortionate activities are a part of the defendants' well-organized efforts to prevent abortions from taking place anywhere in this country.

15. Describe the alleged injury to business or property.

[*Response:*] The primary injuries caused to the plaintiff by the enterprise is the hinderance [sic] of normal routine police activities within the Town of West Hartford as well as the cost of increased manpower and equipment needed to respond to the illegal activities conducted by the enterprise within the Town of West Hartford. In addition, the enterprise has resulted in injury to at least one police officer, albeit minor, within the Town of West Hartford for which the plaintiff may be liable.

16. Describe the direct casual [sic] relationship between the alleged injury and the violation of the RICO statute.

[*Response:*] The plaintiff Town of West Hartford is, in effect, an innocent bystander which has been injured as a direct result of the Operation Rescue efforts to shut down the Summit Women's Center in West Hartford. The goal of Operation Rescue is, in part, to prevent police response to Operation Rescue activities from being effective. As a result, increased manpower is needed to deal with Operation Rescue-sponsored protests as is a correlative reduction in police protection for the balance of the Town.

## C. The Preliminary Injunction.

On July 10, 1989, soon after the issuance of the RICO Case Order, the Town submitted to the district court an application for a preliminary injunction restraining defendants from, *inter alia:* entering any facility "providing abortion services within the Town"; blocking, impeding, or in any way obstructing access to such a facility; and "imped[ing] the passage of any person entering" therein.

In its Ruling on the Motion for Preliminary Injunction entered September 21, 1989, the district court raised *sua sponte* the issue of subject matter jurisdiction, but concluded after examining the Complaint that federal jurisdiction was properly invoked, as follows:

Plaintiff claims that defendants have operated a RICO "enterprise," Operation Rescue, through a pattern of racketeering activity, including violations of the Hobbs Act, 18 U.S.C. § 1951. The "pattern of racketeering" alleged is the plan-

ning and carrying out of trespassory entries and occupations of the Center for the purpose of intimidating the Center, its patients and employees. The gravamen of plaintiff's complaint is that defendants seek by these occupations to extort from the Center its right and ability to conduct its activities and to extort from the Town its ability to protect the rights of the Center, its patients, and the Town's citizens. Plaintiff claims injury in the form of overtime expenses, injury to an employee, and interference with ability to provide police, fire and other emergency services to its citizens.

726 F.Supp. at 376.

The district court proceeded to consider the availability of injunctive relief under the various asserted claims. It declined to grant an injunction based upon the RICO claim, ruling that 18 U.S.C. § 1964(c) (1988) does not authorize the remedy of injunction for a private party, *id.* at 376–78, but concluded that an injunction could properly issue under the pendent state common-law claim of public nuisance, *id.* at 380–82. The court accordingly issued a preliminary injunction barring the following parties from entering or remaining upon the property or offices of the Center, or blocking, obstructing, or otherwise impeding access thereto:

> defendants Operation Rescue, John Kladde, John Charles Grant, Jean Pollock, Catherine A. Jersey, Lillian A. Loughlin, William Calvin, William P. Cotter, and Hjalmar Syversen, and ... their officers, agents, servants, employees and attorneys, and ... those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

*Id.* at 384.

This appeal followed.

## Discussion

A. Principles of Subject Matter Jurisdiction.

■ This action was brought pursuant to the statute granting federal question jurisdiction, 28 U.S.C. § 1331 (1988). Defen-

dants-appellants contend that the Town has failed properly to invoke that jurisdiction because it has not presented even minimally plausible claims (1) that "racketeering activity" within the meaning of 18 U.S.C. § 1962(c) (1988), in the form of predicate acts of extortion indictable under 18 U.S.C. § 1951 (1988), has occurred; or (2) that the Town has been "injured in [its] business or property" within the meaning of 18 U.S.C. § 1964(c) (1988). For the reasons that follow, we agree that there is no subject matter jurisdiction over this action.

The question of subject matter jurisdiction must be confronted at the threshold of the case. As the Supreme Court stated in *Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501:

> Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto. See *e.g., Marbury v. Madison,* 1 Cranch (5 U.S.) 137, 173–180 [2 L.Ed. 60] (1803). For that reason, every federal appellate court has a special obligation to "satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review," even though the parties are prepared to concede it. *Mitchell v. Maurer,* 293 U.S. 237, 244, 55 S.Ct. 162, 165, 79 L.Ed. 338 (1934). See *Juidice v. Vail,* 430 U.S. 327, 331–332, 97 S.Ct. 1211, 1215, 51 L.Ed.2d 376 (1977) (standing). "And if the record discloses that the lower court was without jurisdiction this court will notice the defect, although the parties make no contention concerning it. [When the lower federal court] lack[s] jurisdiction, we have jurisdiction on appeal, not of the merits but merely for the purpose of correcting the error of the lower court in entertaining the suit." *United States v. Corrick,* 298 U.S. 435, 440, 56 S.Ct. 829, 831–32, 80 L.Ed. 1263 (1936) (footnotes omitted).

Consideration of the issue of jurisdiction is not equivalent, however, to an evaluation of the merits of a party's federal claim. Accordingly, a case that cannot survive a

motion to dismiss for failure to state a claim upon which relief can be granted, *see* Fed.R.Civ.P. 12(b)(6), may nonetheless properly be in federal court. The Court addressed this distinction in *Montana–Dakota Utils. Co. v. Northwestern Pub. Serv. Co.,* 341 U.S. 246, 249, 71 S.Ct. 692, 694, 95 L.Ed. 912 (1951), as follows:

> As frequently happens where jurisdiction depends on subject matter, the question whether jurisdiction exists has been confused with the question whether the complaint states a cause of action.... If the complaint raises a federal question, the mere claim confers power to decide that it has no merit, as well as to decide that it has. In the words of Mr. Justice Holmes, " * * * if the plaintiff really makes a substantial claim under an act of Congress there is jurisdiction whether the claim ultimately be held good or bad." *The Fair v. Kohler Die & Specialty Co.,* 228 U.S. 22, 25, 33 S.Ct. 410, 411, 57 L.Ed. 716.

In this vein, the Court has fashioned the following test for determining whether federal question jurisdiction exists:

> [I]t is not necessary to decide whether appellees' alleged cause of action ... is in fact a cause of action "on which [appellees] could actually recover." *Bell v. Hood,* 327 U.S. 678, 682 [66 S.Ct. 773, 776, 90 L.Ed. 939] (1946). Instead, the test is whether " 'the cause of action alleged is *so patently without merit* as to justify ... the court's dismissal for want of jurisdiction.' " *Hagans v. Lavine,* 415 U.S. 528, 542–43 [94 S.Ct. 1372, 1382, 39 L.Ed.2d 577] (1974), quoting *Bell v. Hood, supra,* [327 U.S.] at 683 [66 S.Ct. at 776]. (Emphasis added.) See also *Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 666 [94 S.Ct. 772, 776, 39 L.Ed.2d 73] (1974) (test is whether right claimed is "so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy").

*Duke Power Co. v. Carolina Envtl. Study Group, Inc.,* 438 U.S. 59, 70–71, 98 S.Ct. 2620, 2629, 57 L.Ed.2d 595 (1978); *see also State of N.Y. Dist. Attorney Investigators*

*v. Richards,* 711 F.2d 8, 10 (2d Cir.1983); *Giulini v. Blessing,* 654 F.2d 189, 192 (2d Cir.1981) ("For jurisdictional purposes the test is whether the complaint on its face, without resort to extraneous matter, is so plainly insubstantial as to be devoid of any merits and thus not presenting any issue worthy of adjudication."); *George C. Frey Ready–Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.,* 554 F.2d 551, 554 n. 3 (2d Cir.1977).

Against this background, we turn to the question whether the Town's RICO claim satisfies this minimal, yet unyielding, jurisdictional standard.

**B. The Town's RICO Claim.**

"To state a claim for damages under RICO a plaintiff has two pleading burdens." *Moss v. Morgan Stanley, Inc.,* 719 F.2d 5, 17 (2d Cir.1983), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984). First, the plaintiff must assert that the defendant has violated 18 U.S.C. § 1962 (1988), the substantive RICO statute. Specifically, it must be alleged:

> (1) that the defendant (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce. 18 U.S.C. § 1962(a)–(c) (1976).

*Moss,* 719 F.2d at 17. The plaintiff's second "pleading burden" is to allege that he was " 'injured in his business or property *by reason of* a violation of section 1962.' " *Id.* (quoting 18 U.S.C. § 1964(c)).

The Town claims that the "racketeering activity" which occurred in this case consisted of acts of extortion violative of the Hobbs Act, 18 U.S.C. § 1951 (1988). Section 1951 states in pertinent part that:

> (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, *by* robbery or *extortion* or attempts or conspires so to do, or commits or threatens physical violence to

any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

(b) As used in this section—

*　　*　　*　　*　　*　　*

(2) The term "extortion" means *the obtaining of property from another,* with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

Emphasis added.

The primary theory of the Town's RICO claim, as expressed in its complaint, is that defendants undertook activities designed to "extort" from the Town (1) a softened response to future protest activities, and (2) the reduction or abandonment of charges against those arrested in connection with the protests that occurred on April 1 and June 17, 1989. As a somewhat subordinate theme, however, the complaint also claims that the defendants extorted the Center by impeding its performance of abortions, and that this extortion is somehow actionable by the Town.

The Town's response to the district court's RICO Case Order summarized these contentions as follows:

> Operation Rescue, as well as the other named defendants acting in conjunction with others, have repeatedly extorted or attempted to extort from providers of abortion services a closure of their facilities. In addition, the defendants have attempted to extort, on repeated occasions, softened police response to their criminal actions in furtherance of their goal of closing abortion facilities.

The district court made a similar assessment:

> The gravamen of plaintiff's complaint is that defendants seek by these occupations to extort from the Center its right and ability to conduct its activities and to extort from the Town its ability to pro-

tect the rights of the Center, its patients, and the Town's citizens.

726 F.Supp. at 376.

Both in its brief on appeal and at oral argument of the appeal, the Town emphasized the contention that defendants' goal was extortion of the Center, rather than the Town. In either event, the Town claims that defendants' alleged extortion is actionable by the Town. We accordingly consider both contentions in turn.

### 1. *Direct Extortion of the Town.*

■ As earlier stated, "extortion," as defined in 18 U.S.C. § 1951(b) (1988), "means the obtaining of property from another" by wrongful means. It is not surprising that, on appeal, the Town has backed away from the primary theory of its complaint, that defendants sought by their activities a "softened response" to their protests. It is obvious that the realization of this goal would not constitute an "obtaining" of the Town's "property" within any coherent meaning of those terms.

The definition of "property" under the Hobbs Act is admittedly expansive. The Act "speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence." *Stirone v. United States,* 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960). Further, "property" under the Act "includes, in a broad sense, any valuable right considered as a source or element of wealth," including "a right to solicit business." *United States v. Tropiano,* 418 F.2d 1069, 1075–76 (2d Cir.1969), *cert. denied,* 397 U.S. 1021, 90 S.Ct. 1262, 25 L.Ed.2d 530 (1970); *see also Northeast Women's Center, Inc. v. McMonagle,* 868 F.2d 1342, 1350 (3d Cir.), ("Rights involving the conduct of business are property rights."), *cert. denied,* —— U.S. ——, 110 S.Ct. 261, 107 L.Ed.2d 210 (1989).

The Act's requirement that property be "obtain[ed]" is given a similarly broad construction. There is no requirement that the perpetrator of an extortion receive the benefit of his act. *See, e.g., United States*

*v. Clemente*, 640 F.2d 1069, 1079–80 (2d Cir.) ("[W]hether a Hobbs Act defendant personally receives any benefit from his alleged extortion is largely irrelevant for the purpose of determining guilt under that Act."), *cert. denied*, 454 U.S. 820, 102 S.Ct. 102, 70 L.Ed.2d 91 (1981).

Nonetheless, however broadly the statute is read, the term "property" cannot plausibly be construed to encompass altered official conduct. The contention is so blatantly implausible that its rejection requires no aid from the rule of lenity, which is clearly pertinent to the construction of this criminal statute. *See Hughey v. United States*, — U.S. —, 110 S.Ct. 1979, 1985, 109 L.Ed.2d 408 (1990); *Crandon v. United States*, — U.S. —, 110 S.Ct. 997, 1001–02, 108 L.Ed.2d 132 (1990); *Rewis v. United States*, 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971).

We note that both the Town's complaint, *see id.* ¶ 83, and the district court opinion, *see* 726 F.Supp. at 376, mention that the Town incurred overtime police expense as a result of defendants' activities. In our view, this does not provide a colorable basis to claim a Hobbs Act violation. Virtually any conduct that elicits a governmental response will require activity by one or more salaried government employees. It is simply not tenable to translate the activation of such a response into a Hobbs Act obtention of "property," and it is not surprising that the Town has not pressed such a theory in this litigation.

We note further that it would be difficult to construe the defendant's activities as described in the complaint, consisting of resistance to police efforts to clear protesters from the Center and assertedly false accusations of police brutality in doing so, as the "wrongful use of actual or threatened force, violence or fear" within the meaning of section 1951(b). We also note the first amendment implications of any ruling that, for example, the publication of a paid advertisement alleging police brutality (*see* complaint ¶ 80) violates a federal statute which defines a felony punishable by twenty years imprisonment and a fine of $10,000.

### 2. Extortion of the Center Actionable by the Town.

■ This theory is equally untenable. Assuming *arguendo* that interference with the Center's operations constituted extortion of the Center, the role of the Town was, through its police agencies, to terminate the interference and the resulting extortion of the Center. The Town apparently is attempting to contend that (1) by endeavoring to impede or delay the Town's efforts to terminate defendants' extortion of the Center, (2) defendants "used" the Town to extort the Center, thereby (3) extorting the Town. *See e.g.*, the Town's brief on appeal at 23 ("defendants ... seek to take a benefit away from [the Center], to use the Town ... in the process, and to turn the entire affair to their advantage"). So bizarre a construction of the Hobbs Act affronts common sense, much less the rule of lenity.

The district court made clear that, despite the grant of the Center's motion to intervene subsequent to the hearing on the Town's motion for a preliminary injunction, "[p]reliminary relief is here considered only as a question of entitlement of [the Town]." 726 F.Supp. at 373 n. 1. The Town, nonetheless, in its brief and argument on appeal, stresses defendants' alleged extortion of the Center.

We addressed a similar contention in *State of N.Y. by Abrams v. Seneci*, 817 F.2d 1015 (2d Cir.1987), also a civil RICO case, where we said:

A state that sues as *parens patriae* must seek to redress an injury to an interest that is separate from the interests of particular individuals. The state cannot merely litigate as a volunteer the personal claims of its competent citizens. Where the complaint only seeks to recover money damages for injuries suffered by individuals, the award of money damages will not compensate the state for any harm done to its quasi-sovereign interests. Thus, the state as *parens patriae* lacks standing to prosecute such a suit.

*Id.* at 1017 (citations omitted).

So here, whatever RICO claim the Center may have against these defendants, there

is no plausible basis for its assertion by the Town.

### 3. *Injury to Business or Property.*

The Town's inability to assert any plausible Hobbs Act violations against it results in a failure to establish "racketeering activity" within the meaning of 18 U.S.C. § 1962(c) (1988). 18 U.S.C. § 1964(c) (1988) poses still another obstacle to the Town's RICO claim, for it provides a civil remedy only to "[a]ny person injured in his business or property by reason of a violation of section 1962."

Both RICO and the Clayton Act, 15 U.S.C. § 15 *et seq.* (1988), "aim to compensate the same type of injury; each requires that a plaintiff show injury 'in his business or property by reason of' a violation." *Agency Holding Corp. v. Malley–Duff & Assocs.*, 483 U.S. 143, 151, 107 S.Ct. 2759, 2764, 97 L.Ed.2d 121 (1987) (quoting § 1964(c)). Furthermore, "[t]he close similarity of the two provisions is no accident. The 'clearest current' in the legislative history of RICO 'is the reliance on the Clayton Act model.'" *Malley–Duff,* 483 U.S. at 151, 107 S.Ct. at 2764 (quoting *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 489, 105 S.Ct. 3275, 3281, 87 L.Ed.2d 346 (1985)). In light of this history, cases interpreting the meaning of "business or property" in the Clayton Act context have applicability in the RICO area, as well.

In *Hawaii v. Standard Oil Co. of California,* 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972), the State of Hawaii claimed damages for an injury to its general economy allegedly attributable to an antitrust violation. The Supreme Court rejected the state's claim, stating:

> Like the lower courts that have considered the meaning of the words 'business or property,' we conclude that they refer to commercial interests or enterprises. When the State seeks damages for injuries to its commercial interests, it may sue under § 4 [of the Clayton Act, codified at 15 U.S.C. § 15 (1988) ]. But where, as here, the State seeks damages for other injuries, it is not properly within the Clayton Act.

Support for this reading of § 4 is found in the legislative history of 15 U.S.C. § 15a, which is the only provision authorizing recovery in damages by the United States, and which limits that recovery to damages to 'business or property.' The legislative history of that provision makes it quite plain that the United States was authorized to recover, not for general injury to the national economy *or to the Government's ability to carry out its functions, but only for those injuries suffered in its capacity as a consumer of goods and services.*

405 U.S. at 264–65, 92 S.Ct. at 892 (emphasis added, footnote and citations omitted). The Court subsequently explained that "[t]he phrase 'commercial interests' was used [in *Hawaii* ] as a generic reference to the interests of the State of Hawaii as a party to a commercial transaction." *Reiter v. Sonotone Corp.,* 442 U.S. 330, 341–42, 99 S.Ct. 2326, 2332, 60 L.Ed.2d 931 (1979).

The Town contends that the present action is consistent with *Hawaii,* stating:

> The Town has already suffered reduced ability to respond to police and fire emergencies on two separate occasions. The Town has already twice suffered from having its contracted emergency paramedic services impaired. The Town has already suffered from being forced to have its police officers work in an unnecessarily impaired level of alertness; resulting in injury to at least one police officer. Further, if nothing else, the Town has already suffered from overtime wage expenses, which it otherwise would not have incurred. Those expenses totalled over $42,000. These are not the type of "damages for injury to [the Town's] general economy" for which the Court has prohibited recovery under the Clayton Act, let alone RICO. See *Standard Oil Co.,* 405 U.S. at 264 [92 S.Ct. at 892]. These damages are quantifiable, tangible and, in at least two respects, contractual. The damages already suffered by the Town, and threatened for the future as a direct result of the defendants' conduct are entirely proprietary in nature. They are, in effect,

damages to its *business* rather than damages to its more amorphous governmental interests or powers.[2]

Brief on appeal at 14–15 (citations to appendix and footnote omitted).

We are unpersuaded. *Hawaii* refers not only to injuries to a governmental entity's "general economy," 405 U.S. at 264, 92 S.Ct. at 892, but also to its "ability to carry out its functions," *id.* at 265, 92 S.Ct. at 892, as falling outside the concept of statutory injury to its "business or property." The subsequent gloss in *Reiter v. Sonotone,* 442 U.S. at 341–42, 99 S.Ct. at 2332, allowing a governmental entity to recover for such injury only when it functions "as a party to a commercial transaction," makes the point even clearer. Injuries of the sort asserted by the Town do not fall within the ambit of section 1964(c).

We need not rule, however, that the Town's view of section 1964(c) is so implausible that, standing alone, it would warrant dismissal of the Town's RICO claim for failure of subject matter jurisdiction. Suffice it to say that the section 1964(c) problem heightens the already severe inadequacies of that claim which result from the Town's meritless invocations of the Hobbs Act.

We reiterate, finally, our recent admonition that "the purpose of civil RICO liability does not extend to deterring any illegal act ... for which there are state and common law remedies." *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 24 (2d Cir.1990). We have stated "our own views that the RICO provisions cast too wide a net with respect to the civil actions that may be brought." *Beauford v. Helmsley,* 865 F.2d 1386, 1393 (2d Cir.) (in banc), *cert. denied,* — U.S. —, 110 S.Ct. 539, 107 L.Ed.2d 537 (1989); *cf. United States v. Biaggi,* 909 F.2d 662, 686 (2d Cir.1990) (in criminal context, "RICO was not enacted as an automatic sentence enhancement device"). We have also made clear that we will, of course, enforce the statute as written by Congress. *See Beauford,* 865 F.2d at 1386. That does not imply, however, any disposition on the part of this court to countenance fanciful invocations of the draconian RICO weapon in civil litigation. " 'Just as "[w]e are not at liberty to seek ingenious analytical instruments" to avoid giving a congressional enactment the broad scope its language and origins may require, *United States v. Price,* 383 U.S. [787], at 801 [86 S.Ct. 1152 at 1160, 16 L.Ed.2d 267], so too are we not at liberty to recast the statute to expand its application beyond the limited reach Congress gave it.' " *Ngiraingas v. Sanchez,* — U.S. —, 110 S.Ct. 1737, 1743, 109 L.Ed.2d 163 (1990) (quoting *District of Columbia v. Carter,* 409 U.S. 418, 432, 93 S.Ct. 602, 610, 34 L.Ed.2d 613 (1973)).

## C. Pendent Jurisdiction.

■ In light of our determination that the Town's RICO claim must be dismissed for lack of subject matter jurisdiction, we must consider the question whether the pendent state law claims should also be dismissed. We conclude that dismissal is appropriate.

While "[t]he exercise of pendent jurisdiction is a matter committed to the sound discretion of the district court," *Perez v. Ortiz,* 849 F.2d 793, 798 (2d Cir.1988), it is well settled that "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *see also Powell v. Gardner,* 891 F.2d 1039, 1046–47 (2d Cir.1989). Here, since the federal claims are, in fact, "insubstantial in a jurisdictional sense," and the case is only in a preliminary stage, there is no basis for the exercise of pendent jurisdiction over the Town's state law claims against defendants. Accordingly, the complaint should be dismissed in its entirety.

---

**2.** We note that the Town's complaint, para. 83, alleges that defendants' activities "have caused injury to the *governmental* functions and property of the plaintiff ..." (emphasis added), and goes on to specify essentially the same injuries that the Town portrays in its brief on appeal as "damages to its *business* rather than damages to its more amorphous governmental interests or powers."

## Conclusion

The preliminary injunction is vacated, and the case is remanded to the district court with instructions to dismiss all claims asserted by the Town for lack of subject matter jurisdiction. As we previously noted, the Center, after its motion to intervene was granted, joined with the Town in an amended complaint and thereby asserted its own RICO claims. We have not considered the sufficiency of the Center's claims, and the district court may in its discretion do so, consistent with this opinion, on remand. *See Pressroom*, 700 F.2d at 893 n. 9; *Hackner v. Guaranty Trust Co.*, 117 F.2d 95, 98–99 (2d Cir.), *cert. denied*, 313 U.S. 559, 61 S.Ct. 835, 85 L.Ed. 1520 (1941), 317 U.S. 691, 63 S.Ct. 266, 87 L.Ed. 553 (1942); 7C C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1917, at 458–59 ("if there is an independent basis for jurisdiction with regard to the intervenor[,] the court has discretion to treat his pleading as a separate action in order to adjudicate the claims raised by him.").

Costs to appellants on the main appeal, other than appellants Randall A. Terry, Project Life, Inc., Eileen M. Haggerty, Spear Printing Company, and John M. Spear. *See supra* note 1. The parties shall bear their own costs on rehearing.

KEARSE, Circuit Judge, dissenting:

Though I might agree on other grounds that the preliminary injunction should be vacated, I must respectfully dissent from the majority's ruling that the complaint of plaintiff Town of West Hartford ("Town") should be dismissed for lack of federal subject matter jurisdiction.

The Town has sought to set forth a civil RICO claim, *see* 18 U.S.C. § 1964 (1988), on the premise that defendants engaged in extortion against the Town in violation of the Hobbs Act, 18 U.S.C. § 1951 (1988). The Hobbs Act defines "extortion" as "the obtaining of property from another" by wrongful means. *Id.* § 1951(b)(2). As the majority notes, a person may be guilty of extortion under this section even though he personally has not received any benefit from the extortion. *See, e.g., United States v. Clemente*, 640 F.2d 1069, 1079–80 (2d Cir.), *cert. denied*, 454 U.S. 820, 102 S.Ct. 102, 70 L.Ed.2d 91 (1981).

The majority finds that there is no subject matter jurisdiction because it concludes that the Town has not contended that it was deprived of property; the majority states that the mere "elicit[ation of] a governmental response [that] will require activity by one or more salaried government employees" is not the obtaining of " 'property.' " (Majority opinion, *ante* at 103.) Though I might agree with this statement in the abstract, it is inapposite to the present case. The Town has alleged that "defendants ... engaged in a pattern of extortionate acts, as defined under the Hobbs Act, ... and those acts have caused injury to ... property of the plaintiff, including ... extraordinary overtime costs." (Complaint ¶ 83.) I think the assertion that the Town has been forced to expend certain identifiable *extra* sums of money must be accepted as an allegation that it has been deprived pro tanto of "property" within the meaning of the Hobbs Act. The allegation that the Town was required to pay extra moneys to its employees is no less an assertion that it has been deprived of "property" than would be an allegation, for example, that it had been forced against its will to hire an extra employee, or had incurred extra expenses in constructing or operating a municipal building as a result of bid-rigging by suppliers.

Little is needed for a plaintiff to assert a claim sufficient to give the federal court jurisdiction. Where the complaint "is so drawn as to seek recovery directly under the Constitution or laws of the United States," *Bell v. Hood*, 327 U.S. 678, 681, 66 S.Ct. 773, 775, 90 L.Ed. 939 (1946), the district court must entertain the suit unless the federal claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous," *id.* at 682–83, 66 S.Ct. at 776.

> Jurisdiction ... is not defeated ... by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover. For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction.

*Id.* at 682, 66 S.Ct. at 776. A dismissal because of the inapplicability of a federal statute to the facts alleged is more aptly termed one for failure to state a claim than one for lack of jurisdiction, so long as the question presented is nonfrivolous. *See, e.g., Schwartz v. Gordon*, 761 F.2d 864, 867 n. 4 (2d Cir.1985); *Spencer v. Casavilla*, 903 F.2d 171, 173 (2d Cir.1990). I cannot agree that the Town's claim of property loss is so insubstantial as to fail to invoke subject matter jurisdiction.

**106**

The greater weakness in the Town's case, in my view, assuming the Town's extra expenditures as a result of the defendants' actions, is whether the actions themselves may properly be viewed as extortionate. To establish a Hobbs Act extortion claim, there must be proof that the property was obtained "by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). I have serious doubts as to whether the allegedly extortionate actions attributed to defendants by the Town, *i.e.*, principally their resisting arrest, refusing to identify themselves at arraignment, falsely claiming the use of excessive force during arrest, and threatening to renew their demonstrations, are within the scope of this provision. Given this weakness in the Town's case, the preliminary injunction against defendants' demonstrations may well have been an abuse of discretion, and summary judgment against the Town might well be appropriate. But I do not think the case was dismissable for lack of jurisdiction.